Argued and submitted March 3, 1982, reversed and remanded June 1, 1983

**STATE OF OREGON,**
*Respondent on Review,*

*v.*

**WILLIAM WAYNE HANSEN,**
*Petitioner on Review.*

(NO. C 8005-31665, CA 19706, SC 28272)

664 P2d 1095

Wayne Mackeson, Certified Law Student, argued the cause for petitioner on review. On the briefs was Des Connall, Portland.

Stephen F. Peifer, Assistant Attorney General, argued the cause for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

LENT, C. J.

## LENT, C. J.

Police unlawfully[1] entered defendant's residence, believing marijuana there to be present, arrested defendant for possession of marijuana and held him while a warrant was obtained upon an affidavit that did not contain any evidence of probable cause derived from the entry and arrest. The marijuana was not discovered and physically taken until the search pursuant to the warrant. The issue is whether the unlawful entry and "securing of the premises" requires that the marijuana be suppressed.

Throughout the testimony given in the hearing upon the motion to suppress, the term "secure the residence" or a similar term was used. It was almost treated as if it were a term with a universally recognized referent, requiring no explanation. One witness thus explained his meaning:

"Well, by 'secure,' I would say we had our physical presence within the residence. We had the people we were aware of within that residence detained. They weren't going anywhere. We waited until the narcotics officers got there to handle the investigation further. That's what I mean by 'securing the residence,' no one goes, no one comes in.

"* * * * *

"* * * Once I was in, once those people were secure, once the premises were secure, it was turned over to the narcotics officers."

Another police officer testified as to what he meant by stating the "building was secure."

"We were not searching. We were securing the premises for the execution of the search warrant."

When asked why he had gone to the house, the same witness replied:

"To initiate an arrest of Mr. Bradshaw and Mr. Hansen, to secure the premises for execution of a search warrant."

Another of the officers further elaborated:

---

[1] The trial judge held the entry to be unlawful and, upon defendant's motion, suppressed certain evidence obtained before the arrival of the warrant. The state did not appeal, ORS 138.060(3), and both in brief and on oral argument acknowledged that the entry and the "securing of the premises" were illegal.

"Q   Now, when you went into the Hansen home on the day in question, did you look in any of the other rooms?

"A   Did I? I walked into the bedroom to use the phone.

"Q   Well, didn't anyone try to secure the house to make sure there was no one else present?

"A   Well, Officer Bell did, Officer Conlee — I don't know which — specifically which officer specifically did. Some stood there and watched.

"Q   Would it be correct to say that almost immediately after — or shortly after you entered, adequate search was made of the home to make sure there was no one else present?

"A   That's correct.

"Q   All right, and so that included at least looking into every room in the house didn't it?

"A   Yes, sir.

"Q   And —

"A   Closets, that sort of thing, where a person could hide."

The foregoing testimony only indicates what those particular witnesses believed to be the meaning of the term. There was an abundance of conflicting evidence as to what the occupying officers actually did during the two and one-half hours while waiting for the search warrant. The trial court made no written findings of historical fact, i.e., what actually transpired during that period. Neither did the court make any findings to resolve those conflicts during the court's oral decision from the bench some time after the hearing.

What the officers actually did is what "securing" the premises meant in this particular case. What they intended to accomplish might throw light upon reasons for their activities and might help the trier of fact to resolve conflicts, but their intentions are not necessarily synonymous with what happened. Counsel are responsible for developing the evidence as to what happened; the trial court is responsible for deciding what happened. "Securing the premises" does not necessarily mean the same thing in every case.

For want of express findings of historical fact by the trial judge, we must, if we can, infer from the trial judge's ruling on the motion to suppress the marijuana what were the

historical facts. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).[2]

## THE FACTS

Investigation led police to suspect that defendant was selling marijuana. Officer Sawyer, an undercover agent, had gained the confidence of one Bradshaw, from whom, upon prior occasions, he had purchased small amounts of marijuana. Each time Sawyer purchased marijuana, Bradshaw was observed to go to and from defendant's residence, and Sawyer concluded that defendant was Bradshaw's source of marijuana.

On May 8, 1980, Officer Sawyer told Bradshaw that he wanted to purchase a pound or more of marijuana. The two met in a parking lot about a quarter mile from defendant's residence to negotiate the sale. In working out the details, Bradshaw made four trips between the parking lot and defendant's residence, all observed by police surveillance units. Bradshaw and Sawyer eventually agreed that Bradshaw would return to defendant's residence, get a pound of marijuana and bring it to Sawyer.

Bradshaw did not realize that Sawyer was an undercover agent, and there is no evidence in the record from which it could be inferred that Bradshaw would not have brought the marijuana to Sawyer as agreed. Nevertheless, once Bradshaw left the parking lot, Sawyer radioed police surveillance units and ordered them to "secure" defendant's residence if Bradshaw did return there. When Bradshaw reached defendant's residence, uniformed police officers went to the house, gained entry by a subterfuge, arrested defendant and Bradshaw for possession of a controlled substance, marijuana,[3] and conducted a cursory search of the house for the presence of other occupants. During this search, they found and seized various guns.

---

[2] Although *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), involved an appeal in a post-conviction relief case, we have since then, in reviewing trial court rulings on motions to suppress, followed the rule of *Ball v. Gladden, supra,* that if express findings of historical facts are not made, we will "presume" that the historical facts were decided in a manner consistent with the ultimate conclusion of the trial court judge if there is evidence from which the facts could be so found.

[3] One of the officers who participated in the initial entry and arrest testified that the arrest was for "possession of the controlled substance, marijuana." At that time marijuana had not yet been seen on the premises.

The searching officers notified Officer Sawyer that they had "secured" the residence. Sawyer then proceeded to finish preparing an affidavit for a search warrant and procured one. The police held defendant and Bradshaw for some two and one-half hours until Sawyer arrived with the search warrant. Since there is no evidence to contradict what the officers swore in this respect, and since it establishes the facts in the best light to the prevailing party on the denial of the motion to suppress the marijuana, we take it as established that neither defendant nor Bradshaw was free to leave, with or without any objects, and that no one other than police officers were to be admitted pending arrival of the warrant.

They then conducted an extensive search of the residence, finding two quantities of marijuana: a "plastic baggie" from atop a bookcase in the room where defendant had been held and a "couple of plastic bags behind a radio in a small room just off the master bedroom."

Defendant moved to suppress[4] the guns located during the preliminary search, statements he had made while held

---

[4] The motion was grounded upon ORS 133.683 and both state and federal constitutional provisions. ORS 133.683 provides:

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."

The closest the trial court came to pertinent findings embraced by this statute was to find that the warrant search was not "tainted by the illegal warrantless arrest." Absolutely no mention of deterrence appears from the trial court's ruling.

Article I, Section 9 of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution, applicable to the states by reason of the Due Process Clause of the Fourteenth Amendment, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

in his residence, and the two quantities of marijuana. The trial court granted this motion as to the guns and statements, but denied it as to the marijuana. It found that the police had sufficient independent information to establish probable cause for a warrant to issue, and ruled that the search for the marijuana was not tainted by the "illegal warrantless arrest." The court did not expressly address the effect, if any, of the initial, illegal entry. Defendant was convicted of possession of the marijuana, a controlled substance. ORS 475.992.

Defendant appealed to the Court of Appeals, which affirmed his conviction, stating:

> "Assuming without deciding that the police entry into and securing of defendant's residence was illegal, we are satisfied that that did not vitiate the subsequent search with a search warrant issued in reliance on information other than that gained during the entry and 'securing' of the residence."

*State v. Hansen,* 54 Or App 465, 470, 635 P2d 390, 392 (1981).

Quite simply, what the police officers did in "securing" the residence was to seize it in the constitutional sense. In *State v. Drouhard,* 31 Or App 1083, 572 P2d 331 (1977), the Court of Appeals so recognized, and we approved that recognition in *State v. Matsen/Wilson,* 287 Or 581, 601 P2d 784 (1979).

In the case at bar, defendant argues that the seizure of the house was a seizure of everything in the house and, therefore, the illegal seizure of the house is likewise an illegal seizure of the contents.[5] Since this seizure preceded the arrival of the warrant, contends the defendant, the later seizure in the warrant search is of no avail to the state.

The state argues that there was no seizure of the marijuana until the warrant search. It takes the position that the seizure did not occur until the marijuana was found and physically possessed. That seizure, the state contends, was not an exploitation of the illegal seizure of the house or of the defendant because the warrant was obtained on evidence of probable cause derived dehors the seizure of the house and of the

---

[5] Defendant makes an alternative argument that the kind of analysis that finds its genesis in *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed2d 441 (1963), and *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981), has no application to primary evidence as distinguished from derivative evidence of the kind with which *Wong Sun* was concerned.

defendant. In making that argument, the state relies upon *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed2d 441 (1963). The state's argument only indirectly, if at all, meets defendant's claim that the marijuana had already been seized by the seizure of the house. That argument of the state ignores the defendant's point that this case is concerned with the very evidence the police sought to obtain by "securing" the premises, whereas, in *Wong Sun* the United States Supreme Court was concerned with the admissibility of "derivative" evidence, as we shall later discuss in this opinion.

It seems to us that defendant's argument that seizure of the house was a seizure of all its contents must be addressed head-on, for if the marijuana was seized at the time of securing the premises, arguments as to want of exploitation of the original unlawful conduct of the police are simply beside the point. Neither party cites to us any decision of the United States Supreme Court that holds that a seizure of a house is or is not a seizure of the contents under the Fourth Amendment. Neither party refers us to any decision of this court that holds that a seizure of a house is or is not a seizure of its contents under Article I, Section 9 of the state constitution.

Defendant refers us to *People v. Shuey,* 13 Cal 3d 835, 120 Cal Rptr 83, 533 P2d 211 (1975). There a "confidential informer" had told a police officer that within the past four days the informant had seen several lids of marijuana in the residence of defendant. Five days later that police officer and two others went to the residence to investigate. When the defendant answered the door, the police identified themselves, revealed that they had information that there was marijuana at the location and sought permission to search. Defendant refused either to discuss the matter or consent to the search, and the lead officer left to obtain a search warrant. The two remaining officers entered the apartment uninvited, but without physical resistance from defendant, for the avowed purpose of "securing the premises." They kept defendant under observation but did not search. Another police officer arrived with a warrant some three hours after the police entered the residence, conducted a search and found marijuana.[6] The court

---

[6] By the time the case reached the California Supreme Court, it had been considered in two separate divisions of the intermediate appellate court. The Supreme Court held that the law of the case prevented the state from relying upon a theory of valid arrest of defendant to support the securing of the premises and the later seizure of the marijuana.

held that the illegal occupation of the premises constituted a seizure of defendant's person and property.

> "Analytically this case can be regarded simply as involving a de facto, inchoate seizure of the person and property of [defendant] the moment the police began the illegal occupation. Thereafter the obtaining of the warrant could no more operate 'to disinfect this conduct' (30 Cal. App. 3d at p. 540, 106 Cal. Rptr. 452) than if the police had actually seized the individual items sought to be suppressed prior to acquisition of the warrant.

> "* * * We are further convinced, however, that in the present context the entire question whether there was a causal nexus between the illegality and the seizure is superfluous because the 'securing' of the premises was itself the seizure and as such occurred contemporaneously with the illegality." (Footnote omitted.)

533 P2d at 222.

Although *Shuey* was cited in defendant's brief in the Court of Appeals, neither the state in its answering brief nor the Court of Appeals made any reference to the case. Perhaps this was because the decision is not binding authority upon either the Court of Appeals or this court; however, the reasoning of the *Shuey* court that warrantless seizure of the residence is also warrantless seizure of the contents, making the subsequent warrant seizure a nullity, should be addressed.

Defendant further cites *State v. Dorson,* 62 Haw 377, 615 P2d 740 (1980). In that case, a police informant bought marijuana from defendant in defendant's residence and before leaving saw another bag of marijuana in the living room. Later in the day, the police arrested defendant away from the residence and without the knowledge of defendant's wife. Following the arrest, the lead officer directed other officers to "secure" the residence while the lead officer obtained a warrant to search. One of the officers who went to the residence testified that it was their intent to "secure" the residence to prevent the destruction of evidence. The trial court found the historial facts to be:

> "That police officers Richard Akamu, Wesley Perreira and Roland Pacheco entered the Dorson residence without use of force and in a peaceable manner and that their intent in

entering the Dorson residence was to secure and preserve the Dorson residence pending receipt of the search warrant from Hilo and to notify the occupants of their purpose and the fact that a search warrant for marijuana was being prepared at that time.

"That the officers did not search the Dorson residence nor did they seize any evidence or items from the residence at the time of their entry into it; further, that the actions of the officers was limited to checking the living areas of the residence for occupants so as to preserve and secure the residence and to inform the occupants of their intentions."

615 P2d at 743. In reversing the trial court's denial of a motion to suppress the marijuana found in a search pursuant to the warrant, the Hawaii Supreme Court held that the actions of the police at the premises had the effect of sealing the premises, constituting a seizure of both the house and its contents and that the later search and seizure did not "validate" the warrantless search and seizure of the house and its contents.[7]

The state concedes that *Dorson* is contrary to its position but argues that the decision is "defective" for a "complete lack of *Wong Sun* analysis."[8] That argument does not come to grips with defendant's contention that the seizure of the house is a seizure of the contents and that a later second seizure of the contents, no matter how lawful and valid, is of no avail. The case of *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed2d 441 (1963), is not the proper point of departure for analysis. That case was concerned with derivative evidence, not primary evidence. There were two defendants in that case, Wong Sun and James Wah Toy. Police officers unlawfully entered Toy's living quarters and unlawfully arrested him. Toy sought to suppress statements he then made to the officers in Toy's bedroom. The case holds that the statements should have been suppressed because they were evidence "derive[d] so immediately from an unlawful entry and an unauthorized arrest." 371 US at 485, 83 S Ct at 416, 9 L Ed2d at 452.[9]

---

[7] The Hawaii Supreme Court relied upon three cases for its holding that there was a seizure of the house and its contents: *State v. Drouhard,* 31 Or App 1083, 572 P2d 331 (1977); *People v. Shuey,* 13 Cal 3d 835, 120 Cal Rptr 83, 533 P2d 211 (1975); *State v. Bean,* 89 Wash 2d 467, 572 P2d 1102 (1978).

[8] *Wong Sun v. United States, supra,* n. 5.

[9] The unlawful entry of Toy's living quarters, if considered to be a seizure of those quarters, and the contents therein, could not be a seizure of his statements; they did

Toy's statements were to the effect that another person (subsequently identified as Johnny Yee) at another residence had narcotics. The officers proceeded to Yee's residence where they entered and found Yee in the bedroom. Yee produced narcotics and surrendered them to the officers. Toy sought to suppress that evidence, and the court held that the narcotics should be suppressed because they were obtained by exploitation of Toy's unlawfully obtained declarations. There is nothing in that situation akin to that obtaining in the case at bar. There was no claim made, nor could there have been, that the narcotics were seized at the time of the unlawful entry into Toy's residence.

The other holding as to Toy, i.e., that his statement made to the police several days later was not admissible turned upon a failure of corroboration and is not apposite to the case before us.

As to Wong Sun, the facts are that after the scene in Yee's bedroom, Toy and Yee were taken to a government office where they stated the narcotics had been acquired from one later identified as Wong Sun. Toy pointed out Wong Sun's residence, and the officers there unlawfully arrested him. A few days later, he gave the officers an "unsigned statement." The court held the statement to be admissible because the connection between Wong Sun's unlawful arrest and the making of the statement had become so attenuated as to dissipate the taint arising from the unlawful police conduct. This aspect of the case has no bearing upon a claim that the challenged evidence was seized either at the time of entry into Wong Sun's residence or when he was arrested.

The court also held that the narcotics obtained from Yee were admissible as against Wong Sun because:

---

not yet exist. That part of the case does not deal with the issue here posed. Likewise, suppression of the statements of defendant in the case at bar cannot be analyzed under the theory of defendant that seizure of the residence was a seizure of the contents. The suppression of the statements must be analyzed as in *Dunaway v. New York,* 442 US 200, 99 S Ct 2248, 60 L Ed2d 824 (1979), and *Brown v. Illinois,* 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975). The state, on the other hand, cannot successfully contend that the statements were seized in the warrant search. They had already been made and received by the police through the sense of hearing.

"The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of persons or premises which would entitle Wong Sun to object to its use at trial."

371 US at 492, 83 S Ct at 419, 9 L Ed2d at 458. This part of the *"Wong Sun* analysis" has nothing to do with the situation in the case at bar. This was nothing more than a holding that it was not Wong Sun's rights which were invaded by the police conduct which resulted in obtaining the heroin as evidence. *Compare Rakas v. Illinois,* 439 US 128, 99 S Ct 421, 58 L Ed2d 387 (1978).

The claim in *State v. Dorson, supra,* and in the case at bar that the contents of the residence were seized when the residence was seized is not analogous to any of the claims or circumstances present in *Wong Sun.* A lack of *Wong Sun* analysis cannot be the reason to denigrate the decision in *Dorson.*

The defendant and the *Dorson* court both cite *State v. Bean,* 89 Wash 2d 467, 572 P2d 1102 (1978), as authority for the proposition that a seizure of the residence is a seizure of its contents. That case involved two defendants, Bean and Troutman. Bean's situation involved an automobile search and is not pertinent. In Troutman's case, the police made a warrantless entry of Troutman's residence to secure it while a search warrant was being obtained. Both the trial court and the Washington Supreme Court found there were no exigent circumstances to justify the warrantless entry. About 45 minutes after entry, a warrant was obtained and served, leading to the discovery of a quantity of marijuana not previously seen by the officers during the occupation prior to the arrival of the warrant. Quoting the same language we have quoted *supra* from *People v. Shuey,* the Washington Supreme Court held the evidence obtained upon the warrant search was to be suppressed. We conclude that by the quotation from *Shuey* the Washington Supreme Court meant to endorse the holding that a seizure of the residence is a seizure of the contents thereof.

The state has not discussed *Bean* in its brief.

Defendant also relies upon *United States v. Allard,* 634 F2d 1182 (9th Cir 1980). There the government agents had "secured" a hotel room as one step in obtaining evidence thought to be present in the room. One of the agents called the United States Attorney, and he prepared an affidavit for a warrant. The affidavit was silent as to the "securing" of the room and recited evidence of probable cause for the search that did not rely upon anything learned by reason of the "securing" of the room. The warrant was served some two hours after the agents entered the room, and evidence was discovered in the warrant search. The court held that the evidence must be suppressed, but one aspect of the opinion is puzzling. Near the outset of the opinion the court said:

> "We hold that suppression is required because *the ongoing illegal seizure of the contents* of the hotel room could not, under these facts, be cured by procuring a search warrant even though that warrant was not based upon facts discovered as a result of the illegal seizure." (Emphasis added.)

634 F2d at 1183. A few paragraphs later, the opinion states:

> "As we shall point out, the fact that the search warrant was 'untainted' does not immunize the government from a suppression motion because in this case the evidence was illegally seized *before* the search warrant was obtained." (Emphasis in original.)

634 F2d at 1184. The emphasis reveals that the court considered that the evidence was seized when the premises were "secured" and that that fact was important to analysis. Indeed, the court went on to say:

> "It appears to us, however, that where, as here, the entry and search[10] were not the sole unlawful conduct but were followed by a continuing illegal *seizure,* we must consider the implications of that unlawful seizure." (Emphasis in original.)

634 F2d at 1185. The court went on to discuss one of its earlier decisions, *United States v. Bacall,* 443 F2d 1050 (9th Cir 1971), *cert den,* 404 US 1004, 92 S Ct 565, 30 L Ed2d 557 (1971). According to the discussion by the *Allard* court, the *Bacall* court was concerned with the illegal seizure of a warehouse and the taking of fabrics contained therein. The *Allard* court

---

[10]The court had earlier stated that the unlawful entry was properly characterized as a search.

pointed out that the government's case against the defendant in *Bacall* was "in no way based upon the seized fabrics but was in fact based upon other evidence discovered independent of the illegal seizure." The *Allard* court then noted that the *Bacall* court had observed that there would have been no way in which the illegal taint could have been removed had the evidence seized by unlawful entry been the very evidence on which the government sought to convict.[11]

Having so discussed *Bacall,* the *Allard* court again emphasized the fact that it was dealing with a situation in which the room and its contents were seized by the government agents' unlawful actions and that the evidence subsequently discovered was the very evidence challenged. *See* fn. 5, 634 F2d at 1186, where the court distinguishes other decisions.

Having focused upon the points that the illegal entry and securing of the premises was a seizure of both premises and contents, that the evidence had, therefore, been illegally seized before any lawful seizure could take place and that the evidence challenged is the very evidence sought by the unlawful means, the *Allard* court went on to say that all of this shifts the burden "to the government to demonstrate that it would have both independently discovered and successfully obtained the proffered evidence notwithstanding the illegal seizure." 634 F2d at 1187. The opinion explains in a footnote the kind of showing which the government might make in order to prevail:

> "For instance, the government might attempt to prove that under the circumstances the evidence would not have been moved and its discovery would have been inevitable."

Since no such showing had been made, it was held that the evidence should have been suppressed.

We are not sure for what *Allard* may be said to stand. We have reviewed it at some length because defendant has emphasized it in his brief and oral argument. Undoubtedly, it contains what that court describes as a holding that is favorable to defendant's position concerning seizure. It is unfavorable to defendant in that it says, as here pointed out by the state, that the government, having seized the evidence unlawfully

---

[11] *Compare,* n. 5, *supra.*

can yet use it against defendant if the government further seizes it and the further seizure is the product of inevitable discovery by lawful means.

The state relies upon our decision in *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981). In that case, police made an unlawful search of defendant's auto, seeking the fruits of a burglary of a business establishment. Those fruits were found, and we stated they were "seized." 290 Or at 387, 623 P2d at 633. While searching, the police discovered under the front seat items of women's intimate apparel. These items were not removed from the auto because they were unrelated to the burglary of the business establishment. We stated "nothing more was seized." 290 Or at 387, 623 P2d at 633. Defendant was also a suspect in a residential burglary and homicide, and the detectives from a different county who were investigating that crime were apprised of the presence of the undergarments in defendant's auto. Defendant was interviewed and questioned about several other thefts, but the undergarments were not mentioned. Defendant voluntarily consented to a search of his vehicle and, pursuant to that consent, the auto was again searched and the detectives "seized the underwear." 290 Or at 388, 623 P2d at 633. We held that the underwear should not be suppressed because defendant's consent to search was not obtained through exploitation of the "illegal discovery" of the evidence. We went on to hold that because the officers who originally discovered the underwear thought they were acting lawfully and because the discovery was only a "slight intrusion into defendant's reasonable expectation of privacy," there was no reason to "lead us to extend exclusion under the Oregon Constitution beyond that required under the United States Constitution as applied in *Wong Sun.*" 290 Or at 397, 623 P2d at 638-39.

We were not concerned in *State v. Quinn, supra,* with a continuing unlawful seizure of a container, i.e., the auto. The auto was lawfully impounded, i.e., seized; only the search of the auto was unlawful. We stated that nothing more than the fruits of the business burglary was seized in the search of the auto. As the state correctly points out, our analysis that the underwear was not seized as an exploitation of the unlawful search of the auto is in accordance with *Wong Sun.* That does not, however, meet this defendant's argument that there was a continuing illegal seizure of the marijuana by the unlawful

entry and securing of defendant's residence. We did not have before us an illegal seizure of the auto. We did not consider whether the initial discovery of the underwear was a seizure thereof. Moreover, the underwear was not the very evidence sought by the police in the original unlawful entry of the auto. The underwear was derivative evidence, the kind with which *Wong Sun* was concerned.

The facts important to analysis are very much different in this case from those in *Quinn.* There we noted the "slight intrusion" into defendant's expectation of privacy by the search of a car already impounded. Here the intrusion is into defendant's residence.[12] There the police believed their search of the auto to be lawful by reason of a misunderstanding of a deputy district attorney's advice. That is not the case here. Here the police engaged in conduct, securing or "freezing" the premises, that we had held to be unlawful in *State v. Matsen/ Wilson, supra,* a decision handed down over six months prior to securing this defendant's residence.

We do not regard either the analysis of the United States Supreme Court in *Wong Sun* or our analysis in *Quinn* to be controlling in this case.

The state also invites our attention to *State v. Kennedy,* 290 Or 493, 624 P2d 99 (1981). The facts there were such that we assumed, *arguendo,* that the police had made an unlawful "stop" of the defendant, but under a *Wong Sun* analysis, we determined that defendant had voluntarily consented to a subsequent search of his luggage and that the consent was not obtained by exploitation of the illegality. There was no claim by the defendant in that case that the contraband discovered by search of the luggage had been seized at any time prior to the lawful search. The case is not in point.

The state has not cited any statutory or case law that holds that the seizure of a residence is not a seizure of the contents of the residence. In its brief, the state does not even attempt to argue that the contents are not seized. As noted

---

[12] As observed by the United States Supreme Court in *Payton v. New York,* 445 US 573, 585, 100 S Ct 1371, 63 L Ed2d 639 (1980), physical entry of a home is the chief evil against which the very text of the Fourth Amendment to the United States Constitution is directed.

above, the state simply ignores that contention of the defendant, but ignoring it will not cause it to disappear. We now address the issue of what else is seized when a house is "secured," i.e., seized.

It would be easy to hold, as did the Supreme Courts of California, Washington and Hawaii, that a seizure of a residence is a seizure of all the contents and that, consequently, the concept of a subsequent seizure is not viable. We would not go so far. We agree that once evidence or contraband is seized and the seizure continues, it cannot be successfully asserted that the evidence or contraband is somehow further seized by subsequent police action. The sticky point is to determine what is seized when a residence is "secured" or "frozen."

■ It seems reasonable to hold that such items of contraband as are actually discovered by the entering officers or which are clearly visible to the officers should be deemed to be seized. It has been so held in *United States v. Griffin*, 502 F2d 959 (6th Cir 1974), *cert den*, 419 US 1050, 95 S Ct 626, 42 L Ed 2d 645 (1974). There the police had probable cause to believe narcotics were present in defendant's apartment. One officer went to get a search warrant while others proceeded to enter the apartment illegally to "secure" it. The entering officers discovered narcotics in plain view. The narcotics were taken into physical possession four hours later by the officers who executed the search warrant, which had been obtained without reliance on any information obtained by the illegal entry. The trial court suppressed. Upon appeal the government contended that discovery of the contraband was inevitable without any reference to the illegal entry. In affirming the trial court, the Court of Appeals said:

> "The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was 'inevitable' because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment."

502 F2d at 961.[13]

---

[13] A like statement was made by the court in *United States v. Allard*, 634 F2d 1182 (1980), which we have discussed in the text of this opinion. There the court said:

The same result as to discovered contraband obtained in *People v. Hannah,* 514 P2d 320 (Colo 1973). One set of officers was engaged in obtaining a search warrant for the defendant's residence. Another set of officers acting independently and on different information illegally entered the residence and "secured" the occupants and premises. It was found as historical fact that when the warrant officers arrived balloons containing narcotics were "evident on a table." More narcotics were discovered by the search pursuant to warrant. The trial court suppressed all evidence. The Colorado Supreme Court affirmed suppression of the balloons and contents found to be in plain sight when the warrant arrived but reversed as to the evidence found in the warrant search. The court found that as to the latter evidence there was no exploitation of the illegal entry. There is no discussion whatsoever which would indicate that a claim had been made that the securing of the premises amounted to a seizure of all of the contraband at the premises.

In *State v. Fenin,* 154 NJ Super 282, 381 A2d 364 (1977), certain officers had gone to procure a search warrant of defendant's residence. Meanwhile, other officers made what the appellate court assumed, *arguendo,* to be an illegal entry "to secure the premises." Contraband was discovered and seized by the officers who arrived and searched under the warrant. The trial court suppressed the evidence. The appellate court reversed, reasoning there was no exploitation of the illegality; however, the court recognized the result might have

---

"Mechanical application of the traditional *Wong Sun* 'independent source' analysis where a search warrant is subsequently commissioned albeit supported by an affidavit that relies upon independent evidence, would allow police officers to treat the warrant requirement as merely an ex post facto formality."

634 F2d at 1185, fn. 3. Later in the text of the opinion the court stated:

"The room was 'secured' for two hours while the officers awaited the warrant, that is, the room and its contents were *seized.* '[A]dequate deterrence,' *Bacall, supra,* at 1060, of unlawful police activity requires suppression under these circumstances unless the government can demonstrate that the seizure made no practical difference. Any other holding would encourage law enforcement to 'secure' or seize places and things with or without probable cause in the absence of a warrant or exigent circumstances while they seek some independent evidentiary basis to justify a search warrant. Such post hoc justifications are alien to the Fourth Amendment warrant and reasonableness requirements." (Original emphasis, footnote omitted.)

634 F2d at 1186-87.

been different had the evidence been discovered by the illegally entering officers:

> "In the case at bar, it is significant to note that none of the evidence subsequently seized was discovered upon the initial entry. * * *"

381 A2d at 368. Again, there is nothing to indicate that it had been argued to the court that a seizure of the residence was a seizure of all contraband there located.

Having reached the conclusion that such items of contraband as are actually discovered or clearly visible[14] to the entering officers should be suppressed because they are seized in the constitutional sense under both the state and federal constitutions, we must determine whether anything else in a residence is likewise seized by seizure of the residence. We approach this determination in light of our earlier expression that we are not ready to go so far as have our sister states, California, Hawaii and Washington. In other words, we believe that to hold as did the courts of those states that seizure of the residence is seizure of everything therein contained is not necessary to protect the people against unreasonable seizures or searches, but we also believe that under the constitutional guarantees the seizure of the house includes some property or effects present in the residence but not actually discovered or clearly visible to the unlawfully entering officers.

■ We now come back to the defendant's argument that the marijuana must be excluded because it is primary evidence rather than derivative evidence. Again, this is a position that the state really ignores. The state contends for a *Wong Sun* analysis, never ready to recognize that *Wong Sun* is concerned with the fruit of the poisonous tree rather than the tree itself. For all of the language of the *Wong Sun* court, language that is quoted early and often to justify conviction of persons to whom the courts are reluctant to extend constitutional protections that might readily be extended to "ordinary citizens," the *Wong Sun* court had before it issues involving only derivative evidence, not primary evidence.

---

[14] Determination of what is actually discovered or clearly visible to the unlawfully entering officers may be a close question of fact in some cases, but it is the kind of historical fact with which the trial court should be concerned, and a trial court can make express findings, to which the rule of law may be applied.

What was the very purpose of the unlawful conduct of the police in this case? It was to arrest and convict defendant for possession of this primary evidence, this marijuana. How was the unlawful entry to figure in the accomplishment of that purpose? It was to prevent any person from leaving the premises and thereby to ensure that the marijuana believed by the police to be present could not, and would not, be removed. The "securing" of the premises as effectively reduced the marijuana to the control of the trespassing police as if they had actually discovered and taken physical possession of it. We hold this to be a seizure under both the state and federal constitutions and thereby proscribed as being unreasonable for want of a warrant.

It has been suggested that we hold that any object that the police would have prevented from being removed from the residence was seized. We need not decide in this case whether the rule should sweep so broadly. We would leave to another day what to hold where police might, with probable cause, enter a residence unlawfully to reduce to control narcotics, and unknown to those officers and not discovered by them might be entirely different contraband, such as counterfeit money, later discovered in a perfectly good warrant search for counterfeit money.

Reversed and remanded to the circuit court for further proceedings consistent with this opinion.