The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Theo Jay GRIFFIN, Defendant-Appellee.

The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Margaret L. GRIFFIN, Defendant-Appellee.

Nos. 86SA71, 86SA78.

Supreme Court of Colorado, En Banc.

Oct. 20, 1986.

Stanley C. Peek, Dist. Atty., Thomas Hanselmann, Deputy Dist. Atty., Greeley, for plaintiff-appellant.

David J. Vela, Colorado State Public Defender, Kevin L. Strobel, Deputy State Public Defender, and Michael A. Varallo, Greeley, for defendants-appellees.

ERICKSON, Justice.

These interlocutory appeals by the prosecution are from an order of the district court suppressing narcotics seized from the defendants' mobile home pursuant to a valid search warrant. We consolidate both appeals for the purpose of this opinion because the issues are identical. The basis for the suppression order was an unlawful entry into defendants' mobile home that preceded the execution of the search warrant. We affirm in part, reverse in part, and remand the cases for further proceedings consistent with this opinion.

### I.

On September 25, 1985, Greeley police officers recorded a conversation between defendant Theo Griffin and a confidential informant, Jeff Morrow.[1] The recorded conversation contained an offer from Theo Griffin to sell Morrow a stereo and television set that had been stolen. The tape recording included Morrow's statement that he had a buyer for two pounds of marijuana, and Griffin's response that he had four to five pounds of marijuana "weighed out" for sale at his home. Nothing more was said about the narcotics

---

1. Jeff Morrow had been arrested previously in connection with the theft of certain property from Chizmark. Morrow sought and obtained an agreement with a Weld County District Attorney. Morrow agreed to attempt to purchase the stolen property from defendant Theo Griffin in exchange for a recommendation of a deferred sentence to his plea of guilty to a class five felony. Morrow also offered to elicit incriminating statements about narcotics located at the Griffin residence.

transaction, but Griffin and Morrow agreed to meet later the same day to exchange the stolen property. At four o'clock that afternoon, Griffin met Morrow and transferred the stereo and television from a storage shed in Greeley to Morrow's pickup truck. Theo Griffin was immediately arrested for burglary and theft.

After the conversation between Morrow and Griffin was recorded, Greeley police officers informed Weld County sheriff's officers of Griffin's statements regarding the marijuana he had in his home.[2] At approximately 11:00 a.m., Deputy Sheriff Mike Stark was instructed to contact the Greeley Police Department regarding its investigation of Theo Griffin and to prepare an affidavit for a search warrant for the narcotics.

Sheriff's deputies Mary Minahan and John Cooke were dispatched to the general location of the Griffin residence at 3:30 p.m. They conducted surveillance on the home from the outside until Griffin was arrested in Greeley at approximately 4:00 p.m. Upon Griffin's arrest, and while the deputies were waiting for a search warrant, they entered the mobile home and informed defendant Margaret Griffin that her husband had been arrested, and that a search warrant was on its way. Minahan and Cooke proceeded to "secure" the premises by looking through the mobile home to determine if there were other occupants. Thereafter, Margaret Griffin and her son were required to remain in the living room with the sheriff's deputies. Both Margaret Griffin and her brother, who arrived to take the Griffin child from the residence, were not permitted to use the bathroom without a deputy being present. Mrs. Griffin's brother and sister were searched when they left with the Griffin's son. These "precautions" ostensibly were undertaken to prevent destruction of evidence. While they were waiting for the search warrant, the deputies observed two water pipes or "bongs" on the living room table, but did not conduct a search of the mobile home until the search warrant arrived some two hours later.

After changes were made in the affidavit to comply with the judge's requirements, the search warrant was issued at 6:00 p.m. and was executed at the Griffin residence at 6:30 p.m. Thirty-three pounds of marijuana, one and one-half pounds of hashish, and three-quarters of a pound of psilocybin mushrooms were discovered and seized. Defendant Margaret Griffin was placed under arrest. Both defendants were charged with Possession of Marijuana and Marijuana Concentrate with Intent to Distribute, and Possession of a Controlled Substance (Schedule I).[3]

■ The defendants moved to suppress all of the evidence seized at the Griffin residence. The trial court found that the affidavit of Deputy Stark was sufficient to establish probable cause even after certain paragraphs containing erroneous or stale information were stricken.[4] However, the trial judge held that the initial entrance by the sheriff's deputies constituted a warrantless seizure of the premises and all of its contents in violation of the United States and Colorado constitutions. All evidence obtained from the mobile home was suppressed.

---

**2.** The Weld County Sheriff's Department was informed of the investigation and the taped conversation because Griffin lived in a mobile home in Eaton, Colorado, which is located outside the Greeley Police Department's jurisdiction. The Weld County Sheriff's Department was the proper authority to execute a search warrant at that location.

**3.** Each defendant was also charged with a third count, possession of a controlled substance (schedule I). The third charge was dismissed against both defendants.

**4.** Defendant Theo Griffin urges, as an alternative ground for affirming the suppression of the narcotics, that the affidavit supporting the search warrant was insufficient to give rise to probable cause. The district court decided this issue in favor of the prosecution and determined that the affidavit was sufficient to allow for a finding of probable cause. We are therefore without jurisdiction to consider the issue on an interlocutory appeal pursuant to C.A.R. 4.1. *People v. Oates*, 698 P.2d 811, 815 n. 5 (Colo.1985); *People v. Barton*, 673 P.2d 1005, 1006 n. 1 (Colo.1984).

## II.

A warrantless entry and arrest of a suspect in his home is illegal unless the prosecution establishes the existence of probable cause and exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *People v. Bustam,* 641 P.2d 968 (Colo.1982). The threat of immediate destruction or removal of evidence is an exigent circumstance justifying a warrantless search. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *People v. Turner,* 660 P.2d 1284 (Colo.1983).

The trial judge found that there was probable cause to search the residence for contraband. However, the trial judge found, and the prosecution concedes, that there were no exigent circumstances to justify the warrantless entry by the sheriff's deputies. The trial court's determination that the initial entry was unlawful was correct, and the prosecution has conceded that the two bongs seized as evidence in plain view must be suppressed. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *People v. Hannah,* 183 Colo. 9, 514 P.2d 320 (1973).

The central issue is whether the trial court properly suppressed the narcotics obtained as a result of the execution of the search warrant. The marijuana, hashish, and psilocybin mushrooms were not discovered until the valid search warrant was executed.

*People v. Hannah,* 183 Colo. 9, 514 P.2d 320 (1973), permits the admission of evidence obtained pursuant to a valid search warrant despite a previous unlawful entry by law enforcement authorities, so long as the valid search is not tainted by the prior illegality. In *People v. Turner,* 660 P.2d 1284 (Colo.1983), we said:

> In analyzing a case in which there was an initial illegal search by the police followed by a search pursuant to a warrant, the court must determine whether the second search was tainted by the illegality of the first search. If there is clear and convincing evidence that the second search was conducted pursuant to a warrant based on information obtained before the illegal warrantless search, then the evidence would have been derived from a source independent of the initial illegality and should not be suppressed.

*Id.* at 1288 (citations omitted). *See also People v. McFall,* 672 P.2d 534 (1983); *People v. Barndt,* 604 P.2d 1173 (1980).

Here, the evidence is clear and convincing, and uncontroverted, that the search conducted in executing the search warrant was based on information obtained before the illegal entry of the Griffin home. The record shows that neither Minahan nor Cooke conveyed any of their observations of the Griffin home to Deputy Stark while the affidavit and warrant were being prepared. The affidavit contains no mention of anything that might have been learned by Minahan and Cooke while they were awaiting the arrival of the warrant. Under *Hannah* and *Turner,* the trial court improperly suppressed the evidence obtained through the execution of the valid search warrant.

The defendants rely primarily on *People v. Shuey,* 13 Cal.3d 835, 533 P.2d 211, 120 Cal.Rptr. 83 (1975), to support the trial court's suppression of narcotics seized at the Griffin home. In *Shuey,* the police, who did not have a warrant, went to the home of a suspected narcotics dealer and asked the suspect to consent to a search of the premises. When the suspect refused, he was told that the police would nevertheless secure the premises until a search warrant was obtained. A search was conducted when the warrant eventually arrived. The California Supreme Court affirmed the trial court's suppression of all evidence discovered pursuant to the warrant.

> Analytically this case can be regarded simply as involving a de facto, inchoate seizure of the person and property of Paul the moment the police began the illegal occupation. Thereafter the obtaining of the warrant could no more operate to "disinfect this conduct" [citation omitted] than if the police had actually seized the individual items sought to

be suppressed prior to the acquisition of the warrant.

*Shuey* at 13 Cal.3d 846, 533 P.2d at 222, 120 Cal.Rptr. at 94 (footnote omitted).[5]

Other jurisdictions have declined to follow the "de facto seizure" rule. *See State v. Martin,* 139 Ariz. 466, 679 P.2d 489 (1984); *People v. Arnau,* 58 N.Y.2d 27, 444 N.E.2d 13 (1982), as have the vast majority of federal courts of appeal. *See* 1 Ringel, *Search and Seizures, Arrests and Convictions* § 3.3(a) n. 42.2 (1986).

We decline to follow *Shuey* and its progeny in this case. First, it is now established that the fourth amendment to the United States Constitution requires no such rule. In *Segura v. United States,* 468 U.S. 796 (1984), the police entered the apartment of a suspected drug dealer without a warrant. The occupants of the apartment were arrested and removed from the scene, and police officers remained in the apartment to "secure" it until a search warrant arrived some nineteen hours later. A majority of the Court held that where police have probable cause and "secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures." *Id.* at 798 (footnote omitted). *Segura,* leaves some unanswered questions,[6] but the resolution urged by defendants, as a federal constitutional matter, has been rejected.

Our Colorado cases also do not square with the *Shuey* rule. The conduct of police officers in securing suspect premises in *Hannah, Barndt, Turner,* and *McFall* was as intrusive and comprehensive, if not more so, as it was in the present case.[7] Yet we have never equated the securing of a home while a warrant is being prepared and delivered with the seizure of all contents of a home, seen and unseen.

■ The trial judge adequately vindicated defendants' privacy interests by suppressing all evidence directly attributable to the initial unlawful conduct. In our

5. *State v. Dorson,* 62 Hawaii 377, 615 P.2d 740 (1980). *See also State v. Hansen,* 295 Or. 78, 664 P.2d 1095 (1983); *State v. Matsen,* 287 Or. 581, 601 P.2d 784 (1979); *State v. Bean,* 89 Wash.2d 467, 572 P.2d 1102 (1978).

6. While a majority of the Justices joined in the holding of the case, only Justice O'Connor joined the Chief Justice in the following reasoning contained in Part IV of the *Segura* opinion:

We need not decide whether, when the agents entered the apartment and secured the premises, they effected a seizure of the cocaine, the cash, the ammunition, and the narcotics records within the meaning of the Fourth Amendment. By its terms, the Fourth Amendment forbids only "unreasonable" searches and seizures. Assuming, *arguendo,* that the agents seized the entire apartment and its contents, as petitioners suggest, the seizure was not unreasonable under the totality of the circumstances.
*Segura* at 806.

7. In *Hannah,* the police were originally denied entry into the suspect's premises. They "then broke into the apartment, rounded up the occupants and advised them they were 'securing' the apartment until search warrant arrived." *Hannah,* at 11–12, 514 P.2d at 322. In *Barndt,* the defendant was arrested outside his house. The police kicked open the locked door, entered the house and looked through all the rooms and closets "to discover any other person who might harm the officers or destroy possible evidence." *Barndt,* 604 P.2d at 1174. After the premises were thus secured, a guard was stationed at the front of the house, effectively prohibiting unauthorized ingress and egress. In *Turner,* police entered a suspected "speed lab" in a house and garage. The occupants were arrested and drugs and money were seized from their persons. A warrant, based on independent information, arrived three hours later, and additional evidence was seized. While it is not clear if officers were stationed at the premises during the interim, we held that the trial court properly suppressed the evidence obtained during the warrantless arrests of the occupants. However, the "evidence discovered for the first time during the search conducted pursuant to the warrant was properly obtained in compliance with constitutional requirements." *Turner,* 660 P.2d at 1290. In *McFall,* undercover police officers decided to arrest the occupants of a house when they had been discovered. When they knocked on the door to announce their purpose, the police officers heard yelling and sounds of hurried movement from inside. Evidence was seized when they entered the house and later when a search warrant arrived. We held that "the search warrant was not tainted by illegal police conduct and the evidence seized pursuant to the search warrant was improperly suppressed as fruit of the poisonous tree." *McFall,* 672 P.2d at 539.

view, the contents of the home discovered during the execution of the warrant were not "seized" when the deputies first entered the mobile home.

### III.

The trial court's order suppressing the two bongs which were in plain view when the sheriff's deputies entered defendants' home is affirmed. That part of the trial court's order suppressing the evidence obtained during the execution of the valid search warrant is reversed. The case is remanded for further proceedings consistent with this opinion.