Argued and submitted November 29, 1989, affirmed February 7, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# LETA JEAN MASSENGILL,
*Appellant.*

(10-87-10050; CA A50085)

786 P2d 731

Irene Taylor, Salem, argued the cause for appellant. On the brief were Sally L. Avera, Acting Public Defender, and Mary M. Reese, Salem.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Assistant Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals her convictions, on stipulated facts, for unlawful possession, manufacture and delivery of a controlled substance. ORS 475.992(4); ORS 475.992(1).[1] She assigns error to the trial court's denial of her motion to suppress evidence found during a search of her apartment and statements made sometime after the search. The trial court held that the police had unlawfully "seized" defendant's apartment but found that defendant freely and voluntarily consented to a subsequent search and made the incriminating statements "when confronted with the evidence" found as a result of the consensual search. We affirm but for different reasons.

At approximately 11:30 p.m., on November 14, 1987, Sergeant Siel, of the Eugene Police Department, received information from an anonymous informant implicating defendant in the operation of a methamphetamine laboratory. The caller said that a methamphetamine lab was operating out of a vacant apartment in a complex managed by defendant. The location of the suspect apartment was described by the informant.

Siel and Officer Reeves arrived at the apartment complex at approximately 12:30 a.m. and went to apartment #4377, which appeared to be vacant. Siel recognized the odor of methamphetamine coming from the bathroom exhaust vent. During their surveillance, the officers saw a person (later identified as defendant's husband) enter the apartment and remain inside briefly. The officers, because of an earlier experience with defendant, suspected that she had a connection with the lab. Siel requested additional officers to maintain surveillance while he and another officer went to defendant's apartment. They arrived at approximately 2 a.m. Defendant was upstairs asleep. Her adult son answered the door and allowed Siel and Officer Green to enter, because they said that they wanted to get out of the cold. Defendant came downstairs, and Siel, without mentioning his suspicion of the existence of a methamphetamine lab in apartment #4377,

---

[1] The court merged defendant's convictions for unlawful possession of a controlled substance and unlawful delivery of a controlled substance with her conviction for unlawful manufacture of a controlled substance.

indicated that there was a problem with that apartment. Defendant's records indicated that it was vacant. Siel asked for a passkey, ostensibly to investigate that apartment for burglars or trespassers. Defendant gave him a passkey.[2]

Siel left to "take down" the lab, leaving Green in the living room with defendant and her son, with specific instructions not to let anyone leave. The stated purpose of having Green remain in the apartment was to prevent the occupants from leaving or warning anyone in apartment #4377 of the impending raid.

The apartment contained an "active" lab. A man who had just completed the first phase of methamphetamine production told Siel that he was the only person involved. Siel returned to defendant's apartment and confronted her with the existence of the lab. She denied any knowledge of it or of the person who was found inside. Siel then asked her consent for a search of her apartment. Siel took her equivocal response as a denial and informed her that he would attempt to obtain a search warrant. When Siel left, he left Green in the apartment in order to prevent the destruction of any evidence related to methamphetamine possession or manufacture. He said at the hearing that he "froze" the apartment.

After some reflection, and after consulting with her son, defendant changed her mind and informed Green that she would consent to a warrantless search of her apartment. Green radioed that information to Siel, who was then at apartment #4377. As he left to return to defendant's apartment with two other officers, he learned that defendant's husband had been arrested in connection with the lab. When he arrived at defendant's apartment, Siel again explained defendant's *Miranda* rights to her and emphasized that she did not have to consent. Nevertheless, she consented, because she felt that the police would obtain a warrant in any event. The search revealed a handwritten list of chemicals that are used in the manufacture of methamphetamine, a receipt for the purchase of certain precursor chemicals and a "tooting straw." Defendant denied any knowledge of the documents and denied that they were hers. Siel then informed defendant of her husband's

---

[2] Before asking for the passkey, Siel read defendant her *Miranda* rights. He suspected her involvement because of an incident that had occurred 14 months earlier, when, in the course of dismantling a lab in another apartment complex managed by defendant, Siel had found the "cooker" hiding under her bed.

arrest, whereupon she stated, "It's all my fault" and "Everything that's going on, I know about." She told Siel that her husband had nothing to do with the lab and that she "was only doing it for the money."

The trial court found that the officers lacked probable cause to believe that defendant was connected with the methamphetamine lab when they first went to her apartment and that they had seized the apartment when Siel instructed Green not to let anyone leave. *See State v. Hansen,* 295 Or 78, 664 P2d 1095 (1983); *State v. Matsen,* 287 Or 581, 601 P2d 784 (1979). It also found that there were no exigent circumstances that had not been created by the officers. It then concluded that, notwithstanding that illegality, defendant's consent to the search of her apartment was voluntary and that, therefore, the evidence found in the search need not be suppressed.

The parties devote most of their arguments to the correctness of the trial .court's conclusions concerning· the search. However, the stipulated facts on which defendant was convicted do not mention the evidence found in that search.[3]

---

[3] The stipulated facts do not include all of the evidence adduced at the suppression hearing:

"[Prosecutor:]  Both sides have agreed and stipulated that if this case went to trial, that the State would present the following evidence: that on November 14th, 1987, Eugene Police Department officers found an active methamphetamine lab in a vacant apartment in Eugene, Lane County, Oregon. Upon examination of the lab, it appeared that a reaction had been completed and the police seized samples from that methamphetamine lab. These samples were subsequently analyzed by the Oregon State Crime Lab. That analysis showed the presence of methamphetamine and a substance that is used in the manufacture of methamphetamine, phenyl-2-propanone, which is also known as P2P. Both of these substances were at that time and still are Schedule 2 controlled substances.

"The manager of the apartment complex for the apartment where the lab was found is a woman named Leta Massengill, identified as the Defendant. She had possession of the keys to the vacant apartment where the lab was found and had that as part of her job, was the person in charge of the complex where the lab was found.

"Just before the seizure of the laboratory, police were surveilling the area and saw her husband entering the vacant apartment where the lab was later seized. So, based upon that information[,] Leta Massengill was questioned by Officer Rick Siel of the Eugene Police Department. Siel told Mrs. Massengill about the observations concerning her husband and the laboratory. She told Officer Siel that her husband had nothing to do with the lab, and that it was, 'all my fault,' and 'everything that's going on I know about.'

"When asked why she was involved in manufacturing methamphetamine, she told Siel, 'I was only doing it because I needed the money.'

"The indictment has four counts. She's charged with manufacturing of

Therefore, the validity of the search is irrelevant to defendant's conviction, and that assigned error is moot.

The trial court also found that, when defendant was confronted with the evidence found in the search of her apartment, she made certain admissions. It concluded that she made the admissions voluntarily, notwithstanding the initial illegal police conduct. Defendant argues that the trial court's *finding* is supported by the evidence, so we are bound by it. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). She also contends that its *conclusion,* by which we are not bound, *State v. Warner,* 284 Or 147, 585 P2d 681 (1978), is erroneous. The state does not address those contentions directly; it makes only the conclusory argument that the statements were made voluntarily, primarily because it contends that there had been no preceding police illegality and defendant had been advised of her rights and understood them.

We accept neither party's analysis. It is clear from the record that, when defendant was confronted with the evidence found in the search of her apartment, she steadfastly denied any knowledge of it and denied any connection with the lab. It was not until Siel told her that her husband had been arrested in connection with the methamphetamine lab that she made the statements intended to absolve her husband and that incriminated her. Because it was the information concerning her husband's arrest that elicited defendant's

---

methamphetamine and also possession of both methamphetamine and the precursor chemical phenyl-2-propanone, and also delivery. The case would be presented on a parties to crime theory, most notably the fact that her being the manager allowed her to be in a position to furnish the vacant apartment to her accomplices in this scheme.

"The evidence would show that the amount of methamphetamine to be manufactured as part of this laboratory — we are not talking a personal use amount but something that would be used in distributing methamphetamine, and that would be Officer Siel's testimony as part of his expertise in this area.

"Essentially then, what we'd be showing is on a parties to crime theory. And as part of her duties as apartment manager, based upon her admissions, she had possession of the apartment and was an important part of the ongoing manufacturing, that the manufacturing of the methamphetamine was a substantial step towards accomplishing the eventual sale of methamphetamine and was done with that intent. Consequently, the delivery count is being presented based upon the statutory definition of delivery, which is attempted to deliver. Under Oregon law it is the same thing as delivery, and I believe the recent case in the Oregon Court of Appeals has spoken to that and affirmed that that's in fact true. So that would be our evidence on each of the four counts. Thank you."

statements, not the physical evidence derived from the search, the trial court's finding is not supported by the record. However, we agree with its conclusion that the statements were made freely and voluntarily and were not tainted by the claimed prior illegality.

Affirmed.