139 Ariz. 466 (1984)
679 P.2d 489
STATE of Arizona, Appellee,
v.
Glenn Edward MARTIN, Appellant.
No. 5890.
Supreme Court of Arizona, En Banc.
January 31, 1984.
Reconsideration Denied March 13, 1984.
*468 Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Phoenix, for appellee.
*469 Hirsh & Bayles by Robert J. Hirsh, L. Anthony Fines, Michael B. Bernays, Tucson, for appellant.
FELDMAN, Justice.
Glenn Edward Martin (defendant) was convicted of three counts of unlawful sale of a narcotic drug (cocaine) valued at not less than $250.00 and one count of conspiracy in connection with these sales. Martin appeals these convictions on several grounds. In order to consider three questions of constitutional dimension, we took jurisdiction by a transfer order. Rules of the Supreme Court, Rule 47(e)(1), 17A A.R.S.
The facts concern cocaine sales on three separate days in the spring of 1980, the warrantless entry of defendant's home by Department of Public Safety (DPS) officers following the arrest of the defendant and certain pretrial matters. The major issues we address are:
1. Was the defendant convicted of a crime with which he was not charged?
2. Should evidence seized under warrant from defendant's home be suppressed because his home was initially entered without a warrant?
3. Did the trial court commit prejudicial error in admitting co-conspirator statements in violation of defendant's rights under the confrontation clause?
FACTS
DPS case agent Richard Lindback met Lorretta Hamm at a topless bar in Tucson in April, 1980, and arranged to purchase a quantity of cocaine from her. On April 9, 1980, Lindback went to a shopping center in Tucson to meet Hamm. She arrived accompanied by James Phelps, who went to an area near the stores. Hamm met with Lindback in the parking lot. Lindback gave Hamm $700. She walked toward the area where Phelps had gone, disappeared from view, and then returned to deliver a quantity of cocaine to Lindback. Phelps then left the area in a maroon Chrysler driven by a third person.
Interested in determining Hamm's supplier, DPS arranged a second buy to take place at the same shopping center on April 25. This time Lindback purchased the cocaine directly from Phelps in a divided sale. Phelps took half the money from Lindback, disappeared for a time and returned with half the agreed upon cocaine. He then received the remainder of the money, again disappeared from Lindback's view and later returned with the remainder of the cocaine. Between the times Phelps met with Lindback, Phelps was observed consorting with the occupants of a dark Chrysler (not the maroon Chrysler noted in the previous transaction).
The DPS investigation now focused on Phelps and sought to determine his source of cocaine, so another buy was arranged for May 28. On the morning of May 28, Phelps arrived at the shopping center in the same dark Chrysler observed during the April 25 transactions. The car was driven by a woman; Phelps and an unidentified male were passengers. Phelps got out at the shopping center. The car left the area and was followed to defendant's residence. Meanwhile, at the shopping center, Phelps again sold cocaine to Lindback. Lindback and Phelps arranged for a second sale to take place later in the day and Phelps left the area.
That evening, the dark Chrysler, this time occupied by two men, stopped at the shopping center and Phelps got in the car. The three men then drove briefly through a nearby residential area and returned to the shopping center. There Phelps left the car, made a phone call, drove in another car to a nearby residence and then to a drugstore where he met Lindback and was arrested. Meanwhile, the occupants of the dark Chrysler drove to another part of the shopping center. The driver, David Kautenberger (a housemate of defendant), emerged from the car and was arrested as he was about to enter a pharmacy. The passenger, who turned out to be the defendant, moved to the driver's seat and sped out of the parking lot. He was pursued by DPS agents and arrested several blocks away. *470 Although no money or contraband was found on either the defendant or Kautenberger at the time of arrest, the defendant did have a pager on which he could receive 10-second phone messages. After the arrest, several phone messages directed to the defendant were overheard by at least two DPS agents. Each message was from a female who was described as becoming increasingly upset as her periodic messages to "call home" went unanswered.
The DPS agents relayed this information to case agent Lindback, who ordered that defendant's residence be "secured." At about 9:40 p.m., several officers came to the door, knocked, announced that they would enter and proceeded to conduct a "protective sweep" of the house.
Present in the house at the time of this invasion were defendant's daughter, his fiancee (Linda Joynes), and Kautenberger's wife and two small children. The names of the occupants were relayed to Lindback, who had been interrogating Phelps. Lindback then prepared an affidavit for a search warrant which included the names of the persons present in the house as well as conclusions drawn from his questioning of Phelps. A telephonic warrant was issued and a search of defendant's house began at about midnight. In the two and one-half hours between the time that the house was "secured" and the warrant was issued, many DPS agents had crossed the threshold of the house and two or three were apparently stationed in the house at all times. No items within the house were seized at this time. The occupants were held virtually incommunicado for over two hours.[1]
The search under the warrant revealed a safe in a bedroom (the one apparently occupied by the defendant). Upon opening the safe, the DPS discovered a quantity of cocaine and the $1,900 that Lindback had given to Phelps in the cocaine buy on the morning of May 28.
On June 13, 1980, a five-count indictment, CR-03616, was issued by the Pima County Grand Jury charging defendant and Phelps[2] with four counts of "unlawful sale of a narcotic drug valued at not less than $250" in violation of (former) A.R.S. § 36-1002.02(A) and (B), and conspiracy to commit a class two felony. The buyer was not named in the indictment. Defendant argues that prior to trial the prosecution in this case was less than cooperative. It failed to give defense counsel a list of tangible evidence to be produced at trial despite a court order. It did not offer a plea bargain. In addition, the case agent refused to submit to a memorialized deposition requested by the defense counsel. There were numerous pretrial motions and an omnibus hearing on the suppression of the evidence held in January 1981.
A lengthy trial eventually took place in April 1982. Defendant was present, but Phelps, the codefendant, never appeared at the trial and was tried in absentia. Numerous statements made by both Hamm and Phelps were admitted over the continuing objection of the defense that the procedure violated the confrontation clause.
Finally, at the end of all the evidence, the prosecutor revealed his intention to propose alternative theories of defendant's culpability in closing argument  that defendant was guilty of the substantive offenses charged if he either (1) aided Phelps in selling cocaine to Lindback or (2) sold the cocaine directly to Phelps without regard to the subsequent sale of that cocaine by Phelps to Lindback. Apparently, the reason for this form of argument was the lack of evidence linking the defendant directly to the ultimate purchaser (Lindback) and the presence of circumstantial evidence linking defendant to Phelps. *471 Defense counsel objected because the indictment had charged, in each substantive count, that defendant and Phelps had sold the cocaine, implying a joint act consistent with the conspiracy count, and not that defendant sold to Phelps. Hence, defendant argued that he had been given no notice that he was charged with the separate and distinct sale of cocaine to his named codefendant, Phelps. The defense objection was overruled and the prosecutor argued both theories to the jury. The trial court further refused defense jury instructions which would have tempered the prosecution's dual liability theory. The jury found the defendant guilty of conspiracy and three of the four counts of unlawful sale.
WAS DEFENDANT CONVICTED OF A CRIME NOT CHARGED?
Defendant claims that by allowing the prosecution to argue alternate theories of culpability, he was tried and convicted of a crime with which he had not been charged. He protests that a theory of culpability based on sale from defendant to codefendant Phelps cannot be fairly inferred from the indictment charging sale by defendant and Phelps.
"Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." Dunn v. United States, 442 U.S. 100, 106, 99 S.Ct. 2190, 2194, 60 L.Ed.2d 743 (1979). The Arizona Constitution sets out certain rights of the accused in criminal prosecutions.[3] Consistent with these guarantees, Ariz.Rule of Crim.Proc. 13.2(a) states that an indictment "shall be a plain, concise statement of the facts sufficiently definite to inform the defendant of the offense charged." In addition, Ariz.Rule Crim.Proc. 13.3(b) declares that defendants may be properly joined "when each defendant is charged with each offense included" or when several offenses are part of a common plan or conspiracy. These rules seek to give substance to the constitutional guarantees that an accused stand trial with clear notice of the crime with which he is charged.
The state argues, citing State v. Tison, 129 Ariz. 526, 538, 633 P.2d 335, 347 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982), that an accused need not be informed about how his responsibility for his crimes will be proved. The State neglects, however, to mention the predicate for that proposition  that a defendant "was informed of the crimes of which he could be convicted." Id. The state further contends that a buyer's name need not be set forth in an indictment, State v. Gallegos, 99 Ariz. 168, 171, 407 P.2d 752, 753 (1965), and that aiding and abetting need not be specifically alleged. State v. Mendibles, 25 Ariz. App. 392, 543 P.2d 1149 (1975). These are correct legal principles, but they are not clearly relevant under the facts of the case at bench. Here, a conspiracy has been specifically alleged, but, according to the prosecution's alternative theory of culpability, the buyer had been named. The buyer, however, had been named as a seller and co-principal.
We believe that by charging defendant and Phelps with selling, the indictment contemplates a sale to some third party. It would not seem to be in the contemplation of the indictment that Phelps could be both a seller and a purchaser in a transaction. State v. Dwyer, 172 N.W.2d 591, 596 (N.D. 1969) (one who is a purchaser of a narcotic drug could be charged with possession of that drug but not as a seller where only a single transaction for sale is at issue). See also State v. Ennis, 334 N.W.2d 827, 832 (N.D. 1983). To fit the state's theory of defendant's culpability inhering in a separate transaction by sale from defendant to Phelps, the indictment must be interpreted as reading that on May 28th, Martin and Phelps sold cocaine to *472 Phelps. This construction of the indictment could not have been foreseen by Martin and does not conform to the dictates of Ariz. Rule of Crim.Proc. 13.2(a) regarding notice to a defendant of the crime with which he is charged. The state chose to charge two defendants with the same crime  that of selling cocaine. It cannot, after all the evidence, then argue that the defendants are guilty of engaging in separate transactions of selling from one to another despite the fact that these acts might be associated with the crimes actually charged.
The state argues that defendant could have resolved any ambiguity by motion. However, the problem in this case does not arise from the nature of the indictment itself.[4] The indictment clearly charges both Martin and Phelps with the sale of cocaine to an unnamed buyer. The problem arose at the close of evidence, when the indictment was interpreted by the prosecution and the trial court to allow the argument that the defendant could be convicted for sale of cocaine to Phelps. This allowed the prosecutor to argue to the jury that a verdict of guilty could be returned even if that verdict were based on a transaction with which the defendant had not been charged. One cannot tell whether the verdict of guilty is based on defendant's sales of the cocaine to Phelps (an offense for which he was not charged) or for his role as an accomplice in Phelps' sales of the cocaine to Lindback (the crime for which defendant had notice that he was being tried).
The state contends that any error on this issue is harmless because there has been no prejudice to the defendant. Here the jury returned a verdict of guilty after the prosecution had argued a theory of guilt based on acts not charged. It is inconceiveable that such an error could be harmless. See State v. Hensley, 137 Ariz. 80, 88, 669 P.2d 58, 66 (1983) (harmless error test). "Conviction upon a charge not made would be sheer denial of due process." De Jonge v. Oregon, 299 U.S. 353, 362, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937). See also Eaton v. Tulsa, 415 U.S. 697, 698, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693 (1974) (the question is not upon what evidence the jury could find the defendant guilty but upon what evidence the jury did find the defendant guilty) and Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948) (state supreme court upheld a conviction but based its affirmance on a statute other than the one under which the defendants had been tried and convicted; the United States Supreme Court reversed stating that this would be as much a violation of due process as to convict a defendant upon a charge that was never made). The error here was prejudicial and reversal with remand for a new trial is required. Therefore, we address the other issues presented which are likely to be raised on retrial.

THE WARRANTLESS ENTRY OF THE HOUSE AND SUBSEQUENT SEARCH UNDER WARRANT
The defendant moved to suppress the evidence obtained at his house on several theories. His first contention is that the affidavit in support of the search warrant was defective because it included "misleading" statements which, if excised, rendered the warrant unsupported by probable cause. See, Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Second, the defendant argues that the initial warrantless entry into his house was unjustified by any exception to the warrant requirement and was therefore an illegal entry. Thus, the defendant asserts that even though the subsequent search was *473 made under a valid warrant, the evidence found during that search must be suppressed.
Probable Cause
In preparing his affidavit for the search warrant, agent Lindback included certain inferences he had drawn from his interrogation of Phelps. These inferences, which implicated defendant, were characterized as direct statements attributable to Phelps. Because a warrant must inform a neutral magistrate of the underlying facts which are needed to make a determination of probable cause, Franks v. Delaware, supra, Lindback's carelessness in preparing the affidavit made portions of the affidavit of questionable validity. The trial court recognized this problem and asked both the defense and the prosecution to prepare amended affidavits excluding the questionable material. The trial court found that the remaining portions of the affidavit provided sufficient information to support a determination of probable cause. While we believe the evidence in the record on this issue is close, we defer to the trial judge, see State v. Will, 138 Ariz. 46, 49, 672 P.2d 1316, 1319 (1983), and adhere to our position that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to [the validity of] warrants." State v. Torrez, 112 Ariz. 525, 530, 544 P.2d 207, 212 (1975), cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 767 (1976), quoting United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). See also Franks v. Delaware, 438 U.S. at 171, 98 S.Ct. at 2684.
The pattern of association between defendant, Phelps and the two Chryslers in three drug sales made it probable that defendant supplied cocaine to Phelps for sale to Lindback. Surveillance at defendant's house for several hours suggested that defendant may have transported the cocaine from his house to his rendezvous with Phelps. There was no cocaine in the car when it was stopped and defendant apprehended. The final step in this chain was the deduction that defendant, as Phelps' likely supplier of cocaine, retained some quantity of that contraband in his house. Thus, the facts set forth in the amended affidavits would supply a basis for the magistrate to conclude that it was reasonable to search defendant's house for evidence of his alleged drug dealings. See, e.g., United States v. Dubrofsky, 581 F.2d 208, 213 (9th Cir.1978), ("a warrant may be upheld when the nexus between the items to be seized and the place to be searched rests not upon direct observation, but on the type of crime, nature of the items, and normal inferences where a criminal would likely hide contraband"); United States v. Spearman, 532 F.2d 132, 133 (9th Cir.1976) (there is a nexus between a drug seller, his vehicle and his house making it reasonable to infer that drugs may be found on his person, in his vehicle or in his residence).
The Warrantless Entry of the House
At the time the DPS arrested defendant and found no contraband on his person or in his car, they had developed the requisite probable cause to obtain a warrant to search defendant's house. Prior to obtaining the warrant, however, the DPS entered the home. The warrant was issued about two hours after the initial entry and served about thirty minutes later.
"It is a `basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "The simple language of the Amendment applies equally to the seizures of persons and to seizures of property." Id. at 585, 100 S.Ct. at 1379. Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...." United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The Arizona Constitution is even more explicit in safeguarding this fundamental liberty: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const., art. 2, *474 § 8, 1 A.R.S. (emphasis added); but see Malmin v. State, 30 Ariz. 258, 261, 246 P. 548, 549 (1926) (a case involving the search of a vehicle). Thus, whether we look to either the state or federal constitution, we adhere to the rule that, absent exigent circumstances, warrantless entry violates the constitution even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found. Payton v. New York, 445 U.S. at 587-88, 100 S.Ct. at 1381. See also Mincey v. Arizona, 437 U.S. 385, 388-95, 98 S.Ct. 2408, 2411-15, 57 L.Ed.2d 290 (1978). It is precisely a warrantless entry that constitutes the invasion of the home and the infringement of the right of privacy therein. The purpose of that invasion (whether to search or to "merely" "secure") is irrelevant to the aggrieved citizen. See United States v. Reed, 572 F.2d 412, 424 (2d Cir.), cert. denied, sub nom. Goldsmith v. United States, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). Given these propositions, we must examine the facts in the case at bench to determine two questions: (1) were there exigent circumstances justifying the warrantless entry and, if there were not such circumstances, (2) does the unjustified invasion of the home require the suppression of the evidence subsequently discovered in the house pursuant to a warrant issued later?
Exigent Circumstances
The State asserts that there were exigent circumstances (i.e., the potential for the destruction of evidence) justifying a warrantless entry into defendant's home. According to the state the exigency was based on the following. (1) Agents overheard several short messages on the defendant's pager requesting him to "call home." (2) The caller was a female who sounded "very upset." (3) A woman had been driving the Chrysler at the time of the morning cocaine transaction. From these facts agent Lindback concluded "there was a possibility that that female was involved in the transaction." He believed that this same woman was at defendant's house making the calls. He apparently assumed that she would guess that defendant had been arrested. Piecing these facts, beliefs and inferences together, Lindback reached the ultimate conclusion that "there was a possibility that evidence of narcotics or other type of evidence was being destroyed in the residence." Therefore, he ordered the defendant's house "secured" while he prepared an affidavit in support of a search warrant.
The "exigency" in the case at bench turns upon Lindback's tenuous inference connecting the unidentified female caller with the drug transaction. The female driver of the Chrysler in the morning transaction was not identified. There was nothing to indicate that the woman suspected that her friend, the defendant, had been arrested. The DPS agents waited over an hour after the arrest of the defendant before beginning to prepare an affidavit in support of the warrant. It took two hours to prepare that affidavit even though the relevant information supporting probable cause was known to the agents prior to the time the defendant was arrested. The house had been under surveillance most of the day and no suspicious activity had been noted. Even after defendant's arrest, agents waited outside his house for over two hours before the warrantless entry. Evidently those on the scene did not believe that exigency was great. We conclude that Agent Lindback's belief that there was such an exigency was an "inchoate and unparticularized suspicion or `hunch'," Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).
The facts known to agent Lindback were "simply too slender a reed to support the seizure in this case." Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890, 894 (1980). "Mere incantation of the phrase `exigent circumstances' will not validate a warrantless search." People v. Barndt, 199 Colo. 51, 55, 604 P.2d 1173, 1175 (1980). A number of factors are relevant in determining an "exigency." United States v. Reed, supra; United States v. Rubin, 474 F.2d 262, 268-69 (3d Cir.), cert. denied, sub nom. Agran v. United States, *475 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); Finch v. State, 592 P.2d 1196, 1198 (Alaska 1979); Johnson v. State, 662 P.2d 981, 985-86 (Alaska App. 1983); see generally 2 W. LaFave, Search and Seizure §§ 6.5(b), (c) at 437-55 (1978). The fact pattern in the case at bench simply does not square with those cases in which exigent circumstances are found.
One of the more relevant factors in determining the existence of exigent circumstances is "a clear showing of probable cause." United States v. Reed, 572 F.2d at 424. See also 2 LaFave at 440. Under the facts of the case at bench, the officers had probable cause to believe that there was cocaine in the house. However, defendant was not in the house, he was at the police station. There would have been some exigency if the police had known or had probable cause to believe that there was a woman in the house, that the woman in the house was aware of the contraband in the house, that she was aware of the imminent police search, and that she was involved in the criminal activities to the extent that she would have destroyed the evidence. The chain of inference becomes weak at the third link and is without support at the last step.
To allow a warrantless search based on the equivocal grounds asserted in the case at bench would seriously impair the protection given to homes by our state constitution. We are not inclined to create a broad exception to the constitutional sanctity of homes based on the subjective hunches of law enforcement officials.
The state argues there was no search or seizure, only a "securing" of the premises. The term "secure" has no precise meaning as applied to the police procedures at issue here. See State v. Hansen, 295 Or. 78, 80-82, 664 P.2d 1095, 1096-97 (1983). In the past we have approved police efforts to "secure" premises while awaiting a warrant. State v. Smith, 112 Ariz. 531, 544 P.2d 213 (1975).[5] We continue to approve the method of not allowing anyone to cross the threshold and enter a home pending arrival of a warrant. But this stricture includes the police. They also may not cross the threshold absent exigent circumstances. We thus determine that there were no circumstances in this case justifying the warrantless intrusion into the home of the defendant.
The Relationship between the Warrantless Entry and the Suppression of Evidence Discovered after the Warrant Issued
Having established the illegality of the initial warrantless entry into the defendant's house, we are squarely confronted with the issue of whether this violation of the defendant's constitutional rights requires the suppression of evidence subsequently found when the house was searched pursuant to a warrant based on knowledge derived independently of the illegal entry.
Defendant argues that the evidence legally obtained must be suppressed as a deterrent made necessary by the previous illegal entry.[6] We recently had reason to *476 "strongly recommend that warrants always be sought when possible to prevent unjustified incursions into the private affairs of our citizens and to prevent the exclusionary rule from negating the fruits of otherwise proper police investigation." State v. McGann, 132 Ariz. 296, 301 n. 3, 645 P.2d 811, 816 n. 3 (1982). We add that in many cases, such as the case at bench, the issuance and service of a warrant prior to crossing the threshold of the home may also provide law enforcement agents some protection from harm.
There is a three-way split of authority regarding the application of the exclusionary rule to cases in which an initial illegal entry is followed by a search pursuant to a valid warrant. Several jurisdictions have decided that the evidence seized under warrant must be suppressed as a deterrent to police conduct, reasoning that the evidence within the house is actually seized at the moment the house is entered (or "secured"). United States v. Lomas, 706 F.2d 886, 893-94 (9th Cir.1983); United States v. Allard, 634 F.2d 1182, 1186-87 (9th Cir.1980); People v. Shuey, 13 Cal.3d 835, 850, 533 P.2d 211, 222, 120 Cal. Rptr. 83, 94 (1975); State v. Dorson, 62 Hawaii 377, 381, 615 P.2d 740, 744 (1980); State v. Bean, 89 Wash.2d 467, 470, 572 P.2d 1102, 1105 (1978). The rule is followed in these jurisdictions even though no information obtained in the illegal entry was used in the affidavit for the warrant. But see United States v. Spetz, 721 F.2d 1457 at 1466-1468 (9th Cir.1983).
Some jurisdictions have taken the opposite view. New York has held that the search of a residence "pursuant to a valid search warrant based on information obtained prior to and independent of the illegal entry was reasonable and the evidence seized should not be suppressed." People v. Arnau, 58 N.Y.2d 27, 35, 444 N.E.2d 13, 19, 457 N.Y.S.2d 763, 767 (1982) (emphasis supplied). Accord United States v. Segura, 663 F.2d 411, 416-17 (2d Cir.1981) (evidence discovered upon the unlawful entry to secure the premises  suppressed; evidence subsequently discovered pursuant to a valid warrant  not suppressed);[7]See also United States v. Korman, 614 F.2d 541, 547 (6th Cir.), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed. 808 (1980); People v. Turner, Colo., 660 P.2d 1284 (1983). The Arnau court notes that extension of the Allard rule vitiates the doctrines of attenuation and inevitable discovery as well as the independent source doctrine. The court of appeals has recently adopted the Arnau rationale, State v. Bolt (App. 1983) (No. 2 CA-CR 2733, filed October 31, 1983, slip op. at 5).
The Supreme Court of Oregon has enunciated a standard which seeks to deter the police from undertaking illegal invasions of citizens' homes by denying them only the evidence they seek to secure by that invasion (but not evidence of other crimes) when a subsequent warrant is issued on an independent showing of probable cause. State v. Hansen, 295 Or. at 96-97, 664 P.2d at 1105-06 (1983). No doubt this "middle ground" between Arnau and Allard would have effect, but we think such exquisite refinements add to the quiddities already permeating fourth amendment jurisprudence. We believe it should not be adopted unless the future shows that continued attempts to circumvent the warrant requirement of citizens' homes truly do become a standard police *477 practice. See People v. Barndt, 199 Colo. 51, 60-61, 604 P.2d 1173, 1179 (1980) (Erickson, J., concurring in part and dissenting in part). See also People v. Cook, 22 Cal.3d 67, 95-99, 583 P.2d 130, 146-47, 148 Cal. Rptr. 605, 623-24 (1978). We hold, therefore, that the products of a subsequent search under warrant may be admitted at trial, provided the warrant was based on information legally obtained. The trial court did not err in refusing to suppress the evidence obtained under warrant.
ADMISSIBILITY OF CO-CONSPIRATOR'S STATEMENTS
Out-of-court statements of co-conspirators Hamm and Phelps were related by Agent Lindback at trial over the continuing objection of the defendant. The objection was overruled and the trial court judge informed the jury that a conspiracy had been charged and the jury was ultimately to decide if the alleged conspiracy took place. He then said that he would instruct the jury at the end of trial on the proper way to treat this testimony. Later, the trial judge, prefacing his remarks with a similar reference to the alleged conspiracy and the jury's ultimate responsibility in determining whether there was a conspiracy, stated:

I admit this evidence at this time with the caution that if you do not find a conspiracy as alleged in the Complaint, then the statement that may be admitted cannot be considered by you regarding the person against whom it's sought to be introduced at this time; for example, Mr. Martin in this particular case.
* * * * * *

With that caveat and precautionary statement to the jury, you may proceed.
(Emphasis supplied.)
Defendant objects that the trial court's comments were not sufficient or specific enough to "conditionally admit" the evidence and that the trial court improperly left the ultimate admissibility of the statements to the jury. We do not agree. While the trial court may not have expressed itself well on this issue, its precautionary statements to the jury coupled with the final jury instructions indicate that the evidence was conditionally admitted (over a continuing objection) and that the trial court retained ultimate control over the admissibility of the statements. There was sufficient independent proof of the conspiracy[8] and the trial court did not abuse its discretion by varying the order of proof. State v. Ferrari, 112 Ariz. 324, 328, 541 P.2d 921, 925 (1975); State v. Lycett, 133 Ariz. 185, 193-94, 650 P.2d 487, 495-96 (App. 1982).
Defendant next argues that the admission of the statements made by Hamm and Phelps violated his rights under the Confrontation Clause of the Sixth Amendment. Relying on Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), defendant argues that the statements were hearsay, and that admission of any hearsay in a criminal trial requires a showing that the declarant is unavailable, a showing which defendant claims the state failed to make in the case at bench. Defendant makes no claim of specific prejudicial effect from the use of these statements, but we are forced to address the issue since the matter will undoubtedly be raised again when the case is retried. The state contends that the statements of co-conspirators are not hearsay and, therefore, may be admitted under the Roberts rule.
Roberts does hold that the confrontation clause is usually violated by admission of extrajudicial statements where the declarant is not produced for confrontation and cross-examination. It holds further that there is no violation of the confrontation clause when the State is able to show that the declarant is truly unavailable and that the statement falls within a well *478 recognized hearsay exception and therefore bears indicia of reliability. Insisting that a co-conspirator's statement is hearsay, defendant invites us to follow Roberts and disapprove a holding to the contrary by our court of appeals in State v. Politte, 136 Ariz. 117, 664 P.2d 661 (App. 1982). The Politte court noted correctly that under the new evidence rules, co-conspirator's statements are not classified as hearsay at all. Arizona Rules of Evidence, Rule 801(d)(2)(E). We acknowledge, however, that the criminal law has generally treated co-conspirator's statements as hearsay and permitted admission under an exception to the hearsay rule. See Dutton v. Evans, 400 U.S. 74, 84, n. 15, 91 S.Ct. 210, 217, n. 15, 27 L.Ed.2d 213 (1970), discussing the origin of the co-conspirator exception and stating that "such a hearsay exception in the evidence law of many states" has been recognized by the Court.
The court of appeals is correct in its holding (State v. Politte, supra) that under the present rules co-conspirator's statements are not hearsay; defendant is equally correct in arguing that in the past the admissibility of co-conspirator's statements have generally been considered under the hearsay rule and its exceptions. We think, however, that the controversy is not truly relevant to the question of admissibility of such statements. Roberts does not equate the Sixth Amendment with the hearsay rule, nor does it hold that a statement is admissible simply because it is within a hearsay exception. It does hold that "the confrontation clause reflects a preference for face-to-face confrontation at trial." Roberts, 448 U.S. at 63, 100 S.Ct. at 2537. Thus, a showing of a declarant's unavailability is normally required and, even then, extrajudicial statements are admissible only if they bear adequate "indicia of reliability." Roberts dealt with the admissibility of evidence which had been given by a witness at a preliminary hearing and held it admissible despite the confrontation clause because the statement was within a hearsay exception which carried "indicia of reliability." The exception to the confrontation clause does not turn upon the nature of the extrajudicial statement as hearsay or non-hearsay or whether it falls within or without an hearsay exception; certainly, the rules of evidence may be revised from time to time without necessarily violating the confrontation clause. The exception to the confrontation clause is based, rather, upon the view that recognized hearsay exceptions have sufficient "indicia of reliability" so that their use does not offend the clause even though the witness is not produced for confrontation.
Logically, therefore, out-of-court statements which are non-hearsay may be admitted if there are sufficient indicia of reliability, and statements which are within a particular hearsay exception may be excluded absent sufficient indicia of reliability. California v. Green, 399 U.S. 149, 155-56, 90 S.Ct. 1930, 1933-34, 26 L.Ed.2d 489 (1969). Thus, a determination that the statements of a co-conspirator are non-hearsay does not automatically solve the problem of admissibility. We do conclude, however, that even though such statements are now technically classified as non-hearsay, they have been considered to have sufficient reliability to be admissible in the past under a hearsay exception (and now under a rule of evidence). However we label the rule, there is a well-recognized principle of evidence which holds these types of statements admissible. We believe, therefore, that the confrontation clause will ordinarily not prevent the introduction of a co-conspirator statement made, as the rule requires, during the course and in furtherance of the conspiracy. This does not mean that all co-conspirator statements will be admissible. Obviously, examination of the circumstances surrounding a particular statement may indicate the lack of presumptive indicia of reliability which attaches to such statements. See the analysis contained in Dutton v. Evans, 400 U.S. at 88-89, 91 S.Ct. at 219-20; see also United States v. Perez, 658 F.2d 654, 661 (9th Cir.1981); State v. Farber, 295 Or. 199, 206-212, 666 P.2d 821, 825-29 (1983).
*479 Farber states that most of the federal circuits have concluded that case by case examination should be made to determine whether the confrontation right has been infringed by admission of co-conspirator statements. State v. Farber, 666 P.2d at 827; United States v. Perez, supra. Several circuits have held, to the contrary, that co-conspirator statements are within a firmly rooted hearsay exception and that no further guarantee of trustworthiness is needed for admission. See, e.g., United States v. Peacock, 654 F.2d 339, 349 (5th Cir.1981). The United States Supreme Court has been squarely presented with the issue, but has failed to decide it. Dutton v. Evans, supra. Until that Court does decide the issue, we prefer a middle ground for Arizona. In accordance with the well established evidentiary rule, whether it be a branch of the hearsay rule or not, co-conspirator statements made in the course and furtherance of a conspiracy will ordinarily be admissible, notwithstanding the confrontation clause. However, where admissibility is challenged on the ground of reliability the statement should not be automatically admitted. The trial court should test the reliability of the statement, following the analysis used by the United States Supreme Court plurality opinion in Dutton. The Dutton analysis is aptly summarized in Perez:
Although not purporting to enumerate all potentially relevant factors, the Court in Dutton tested the reliability of a co-conspirator's statements under four indicia: (1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. Dutton, 400 U.S. at 88-89, 91 S.Ct. at 219-220. All four elements need not be present in order to satisfy the confrontation clause. In some circumstances, a statement may be admitted over confrontation clause objections even if it does not pass scrutiny under each prong of the Dutton test.
United States v. Perez, 658 F.2d at 661.
We believe that another important factor which should be considered is the importance of the evidence. If the statement is not "crucial" to the state or "devestating" to the defense its use is less likely to violate the Sixth Amendment. State v. Farber, 295 Or. at 212, 666 P.2d at 828; see also the concurring opinion of Mr. Justice Harlan, Dutton v. Evans, 400 U.S. at 93-100, 91 S.Ct. at 222-25; see also Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv.L.Rev. 567, 599-600 n. 97 (1978).
We return, then, to the question of availability. The state refused the trial court's invitation to disclose whether Ms. Hamm was truly unavailable and it did not produce her for cross examination, instead offering her statements under the co-conspirator rule. The state urges us to hold that a showing of true unavailability need not be made in order to warrant the introduction of co-conspirator's statements. It again relies on the court of appeals' decision in State v. Politte, supra. The court of appeals held there that "there is no unavailability requirement in the [evidence] rule and we find none in those decisions which permit a co-conspirator's statements [to be admitted despite the confrontation clause]," Politte, 136 Ariz. at 121, 664 P.2d at 665, citing Dutton v. Evans, supra. It is true that in Dutton a plurality of the court did uphold the introduction of such a statement without a showing of unavailability, reasoning that the utility of trial confrontation was remote. However, ten years later, in Ohio v. Roberts, supra, dealing with the use of sworn testimony from a preliminary hearing, a majority of the court prescribed a two-step analysis for determination of a confrontation clause problems resulting from the use of extrajudicial statements. The first step pertained to availability:

*480 The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case .. . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
Roberts, 448 U.S. at 65, 100 S.Ct. at 2538.
The court followed that comment with a footnote which reads as follows:
A demonstration of unavailability however is not always required. In Dutton v. Evans ..., for example, the court found the utility of trial confrontations so remote that it did not require the prosecution to produce a seemingly unavailable witness.
Id., n. 7. We are unable to determine whether the note means that co-conspirator's statements (the subject of the Dutton opinion) are an exception to the Roberts requirement that a showing of unavailability usually must be made, or whether the footnote means that a showing of unavailability may be dispensed with where the indicia of reliability analysis indicates that there would have been little purpose in confrontation. Until the court clarifies its position on these points, we adopt for Arizona the same type of analysis on the availability showing as is to be used on the reliability issue. If the analysis shows the utility of confrontation would be insignificant, the statement may be admitted even without a showing of unavailability. If, however, the statement was made under circumstances which show doubt as to its accuracy or reliability, the witness should be produced for cross examination or a showing of inability to do so made. See State v. Edwards, 136 Ariz. 177, 181, 665 P.2d 59, 63 (1983). Also, if the statement is of crucial importance to the state, or is extremely prejudicial to the defense, the state should be required to produce the witness or make a showing of its inability to do so.[9]
Turning now to the facts in the case at bench, it may be presumed that Phelps, who was tried and convicted in absentia, was "unavailable" and could not be produced by the state. Even assuming that the state failed to show Phelps' unavailability, we see no error. The statements admitted are those pertaining to the background of the transactions between Phelps, Hamm and Lindback. No statements inculpatory of defendant were offered or introduced. The statements were neither crucial to the state's case nor devastating to the defense. They did no more than provide the jury with the words used prior to and during the cocaine transactions, thus helping the state prove that narcotics had been sold from Hamm to Lindback and helping the jury understand the manner in which transactions between Phelps, Hamm and Lindback took place. The primary contested issue in the case at bench was whether Martin was the supplier who provided the narcotics to Phelps; none of the statements was probative on this point. On the present record, we conclude that the court did not err in admitting the statements.
As indicated, however, the exact statements complained of are not specified. Because we are reversing on other grounds and because complete foundation for admissibility was not made, we need not decide what confrontation clause problems may inhere in the statements on retrial. On remand, the trial court should seek to clarify and resolve the issue in a manner consistent with this opinion.
*481 OTHER ISSUES
The defendant raises three other issues on appeal. Since we are remanding on other grounds we treat these issues briefly.
1. Prior to a new trial, case agent Lindback should submit to a memorialized deposition. State ex rel. Baumert v. Superior Court, 133 Ariz. 371, 651 P.2d 1196 (1982).
2. The failure of the county attorney's office to comply with the initial court order to turn over a list of tangible evidence should not be tolerated. Such conduct does not comport with the Rules of Criminal Procedure, Rule 15.1(a)(4), 17 A.R.S., nor with the ABA Code of Professional Responsibility, EC 7-13. Before trial, the prosecution must make such disclosure. See State v. Stewart, 139 Ariz. 50, 676 P.2d 1108 (1984).
3. The defendant raises a strong claim that the refusal of the county attorney to offer a plea bargain was based on animus towards the defendant's attorney and therefore discriminatory[10] and that the county attorney's office lacks policies concerning plea bargains. The state justifies the refusal by stating that the county attorney does have "some policies" on plea bargaining but that "[w]e simply don't know whether they cover the situation in this case or not...."
A potential for abuses in the realm of plea bargaining is well recognized. See Bordenkircher v. Hayes, 434 U.S. 357, 365, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978). However, there is no right to plea bargain. State v. Morse, 127 Ariz. 25, 31, 617 P.2d 1141, 1147 (1980). "No constitutional provision prevents the full prosecution of all criminal law violators, so long as such prosecution is not tainted with invidious discrimination." Murgia v. Municipal Court for Bakersfield, 15 Cal.3d 286, 290-292, 540 P.2d 44, 46-47, 124 Cal. Rptr. 204, 206-07 (1975). See also Murray v. Thorneycroft ex rel. Arizona, 131 Ariz. 156, 158, 639 P.2d 346, 348 (App. 1981).
Thus, while a prosecutor may refuse to plea bargain with alleged criminal violators, he may not do so solely because defendant has selected a particular defense counsel. The county attorney may not refuse to plea bargain out of animus toward the defendant's attorney. He may plea bargain or not, depending on how this case fits the policies and standards of his office. For instance, he may properly decide, as a matter of policy, that there will be no plea bargains with those accused of selling cocaine, or he may plea bargain only in cases in which there exists substantial doubt of guilt. He must, however, have some valid reason; animus toward defense counsel is not a proper reason.
The judgment of the superior court is reversed and the case remanded for a new trial.
HOLOHAN, C.J., GORDON, Jr., V.C.J., and HAYS and CAMERON, JJ., concur.
NOTES
[1] The testimony at the omnibus hearing was strictly limited to the facts pertaining to the warrantless entry itself. Defendant has no standing to object to the treatment of the occupants of the house. What little evidence there is of the nature of the occupation indicates that those in the house were not free to leave nor were they allowed to make or receive phone calls.
[2] Hamm was also charged but apparently was dropped from the indictment prior to the trial of codefendants Martin and Phelps.
[3] Ariz.Const., art. 2, § 24 provides, in part, that "[i]n criminal prosecutions, the accused shall have the right to ... demand the nature and cause of the accusation against him, to have a copy thereof, ...." Ariz.Const., art. 2, § 30 states: "No person shall be prosecuted criminally in any court of record for felony or misdemeanor, otherwise than by information or indictment; ...."
[4] The state's contention that Ariz.Rules of Crim. Proc. 12.9 and 13.5(c) govern this case is without merit. The defense had no reason to believe the indictment was "defective" until they learned, just prior to closing argument, that the state would seek a conviction for transactions not contemplated by the indictment. Hence, the defense had no reason to pursue remedies under these two rules. There is a strong analogy here to cases which have been reversed on grounds of duplicity. State v. Kuhnley, 74 Ariz. 10, 242 P.2d 843 (1952); State v. Mikels, 119 Ariz. 561, 582 P.2d 651 (App. 1978).
[5] The trial court relied on Smith in ruling that the warrantless entry did not require the suppression of the evidence, not in plain view, that was later uncovered in the search under warrant. The cases that we have decided which mention this issue, including Smith, were decided before Payton and Mincey and their precedential value is rather limited. An examination of State v. Broadfoot, 115 Ariz. 537, 539, 566 P.2d 685, 687 (1977); State ex rel. Hyder v. Superior Court, 114 Ariz. 337, 341, 560 P.2d 1244, 1248 (1977); and Smith, supra, shows that the defendants were arrested at or near their residences and that there was clear knowledge that evidence was in the houses. These cases also arguably rest on an "exigent circumstances" rationale in supporting the initial entry. Finally, it is unclear in Smith or Broadfoot whether the police actually entered the premises which they secured.
[6] Cases such as this provide strong support for the deterrence view. The officers apparently had little, if any, knowledge of the number and age of the occupants present in the house. The entry by the undercover agents carried a potential for danger to both the officers and the innocent occupants of the house. A number of officers entered and took possession of this house, herded the two women and their children into the living room, held them there for over two hours, did not allow them to use the phone to seek legal advice and, in effect, held them incommunicado. The state argues that the police "acted in good faith" and did nothing "outside the norm of police procedures." The objective facts and circumstances cannot support the good faith claim. We assume counsel for the State is engaging in rhetorical overstatement in attempting to assure us that such warrantless intrusions are "normal procedures." If we truly believed this, we might adopt a different rule today to deter such "normal" practices.
[7] This issue was argued before the United States Supreme Court on November 9, 1983 in Segura v. U.S., 52 U.S.L.W. 3383, 3399 (U.S. Nov. 22, 1983) (No. 82-5298). The ultimate trial court disposition of Segura is unreported. See United States v. Segura, 697 F.2d 300 (2d Cir.1982) cert. granted, 459 U.S. 1200, 103 S.Ct. 1182, 75 L.Ed.2d 430 (1983).
[8] This is true unless it were determined that two small conspiracies (Hamm-Phelps) (Phelps-Martin) were involved, rather than one large conspiracy. See Weinstein's Evidence at 801-179 ¶ 801(d)(2)(E)[01]. See generally, Note, "Single vs. Multiple" Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes, 65 Minn.L.Rev. 295 (1980).
[9] We believe that in this way the framer's intent with regard to the purpose of the confrontation clause would be best served. As Justice Harlan points out in his concurrence in Dutton v. Evans, supra, the clause was not intended to freeze the law of evidence or the hearsay rule as it existed in 1787 or 1789. It was intended to give the defendant a right to attend his own trial, to cross-examine the witnesses who were called against him and to give the jury an opportunity to evaluate those witnesses on a personal, face-to-face basis. It was intended, in effect, to subject the defendant to trial under whatever rules of evidence might obtain from time to time, but to prevent trials held entirely or primarily on the basis of affidavit.
[10] We have recently discussed the importance of the right to counsel of one's choosing. State v. Hein, 138 Ariz. 360, 368-69, 674 P.2d 1358, 1366-67 (1983) (right characterized as "not absolute"). The importance of counsel in plea agreements has been recognized. Brady v. United States, 397 U.S. 742, 748 n. 6, 90 S.Ct. 1463, 1469 n. 6, 25 L.Ed.2d 247 (1970). The history and importance of the fundamental right to counsel is amptly summarized in the concurring opinion of Justice Brennan in Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 1618-25, 75 L.Ed.2d 610 (1983).