**V.**

For the reasons stated above, we affirm the award.

GERBER, P.J., and GRANT, J., concur.

897 P.2d 649

**STATE of Arizona, Appellee/Cross Appellant,**

v.

**Victor Raymond DeWITT, Appellant/Cross Appellee.**

**No. 1 CA–CR 92–0916.**

Court of Appeals of Arizona, Division 1, Department A.

Oct. 18, 1994.

Review Granted on issue B and Denied on other issues June 29, 1995.

---

**4.** DOC personnel inserted "O.K." next to the reference to knee problems.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Crim. Appeals Section, Christopher E. Avery, Asst. Atty. Gen., Phoenix, for appellee/cross appellant.

Wisdom, Logan & McNulty by Charles M. McNulty, Phoenix, for appellant/cross appellee.

## OPINION

VOSS, Judge.

In this case we hold: police officers responding to a burglary in progress may reasonably enter the residence without a warrant to search for suspects; an inadvertent discovery while lawfully within the residence merits a new justification for the police officers' presence in the residence; and a war-

rantless entry by others is justified to confirm the first officer's suspicion of ongoing illegal activity.

## I. FACTUAL AND PROCEDURAL HISTORY

On June 4, 1991, Defendant Victor DeWitt's neighbor reported a possible burglary in progress at Defendant's house. Phoenix Police Officer Gary McCaslin responded and spoke with the neighbor. She said that she saw two suspects go into Defendant's backyard. She also stated that Defendant had told her that his house had been burglarized recently and he had described for her someone—either an acquaintance or roommate—whom he thought was responsible.

Officer McCaslin called for backup and then went through a breezeway to the back patio of Defendant's house. He saw curtains blowing out through an open window. He then saw additional movement at the window and believed that someone inside may have seen him. A few minutes later, a male suspect, Scott Peterson, backed out of the house with a bag of pet food in his hand and started to pour pet food in a dish. Officer McCaslin immediately identified himself, handcuffed Peterson, and patted him down—finding a large roll of money in his front pocket. Peterson told the officer that his girlfriend, Mary Johnson, was still inside. At the direction of the officer, Peterson called her out, and Johnson emerged from the open window. When Officer McCaslin questioned them, Peterson said he had permission from Defendant to be in the house but did not know how to contact Defendant. He did not have a key, and he admitted that he had forced his way in through a window.

Believing a burglary had occurred, Officer McCaslin entered the house to look for additional suspects and any evidence of a burglary. Upon entering the northwest bedroom, Officer McCaslin saw an open closet that appeared to have been ransacked. In an open storage space above the closet, he observed chemicals, glass vials, and lab equipment. He suspected that these items may have been used to manufacture drugs. He stayed in the room for only a few seconds

before resuming his search for additional burglary suspects and evidence. After finishing his protective sweep Officer McCaslin called for his supervisor, Sergeant Saylor.

While they were waiting for Sergeant Saylor, Officer McCaslin and the other officers brought Peterson into the living room and sat him on the couch. They detained Johnson on the front walkway by the carport. When Sergeant Saylor arrived, Officer McCaslin escorted him into the bedroom to observe the chemicals and equipment in the closet. After viewing the items, Sergeant Saylor requested assistance from the City of Phoenix Police Department's Drug Enforcement Bureau ("DEB").

Detectives Taylor and Hanss and Sergeant Jaramillo from the DEB arrived about thirty minutes later and entered Defendant's bedroom. One of them stood on a chair to observe the items in the open storage space. Nothing was moved to observe the items, and not one of the items was moved. Detective Hanss then procured a search warrant based on the officers' observations of the lab equipment. During the execution of the warrant, the officers seized methamphetamines and Valium, drug paraphernalia, and recorded phone conversations in which Defendant discussed drug sales. The officers also found ammonium hydroxide, benzene, reagent alcohol, ethyl ether, acetone, mineral oil, glassware, storage bottles, thermometers, other laboratory equipment, and chemistry notes and information on methamphetamine and methandrostenolone.

Defendant was charged with two counts of possession of dangerous drugs for sale, a class 3 felony. Defendant moved to suppress the evidence and an evidentiary hearing was held. The trial court ruled that none of the warrantless entries was unreasonable; however, the subsequent search warrant was not supported by probable cause. After additional briefing, the trial court ruled that the evidence was admissible under the "good faith" exception to the exclusionary rule. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Subsequently, the State charged Defendant with one count of possession for sale of Diazepam, also a class 3 felony. This charge was consolidated with one of the original counts of possession for sale and the remaining count was dismissed.

Defendant waived his right to a jury trial and submitted his case to the court on stipulated evidence and the police reports. The trial court found Defendant guilty of both charges and sentenced him to concurrent, aggravated 7.5–year terms of imprisonment.

Defendant filed a timely Notice of Appeal from the judgment and sentences imposed. He challenges the warrantless entries of his home as violative of his state and federal constitutional rights, and argues that the evidence seized pursuant to the warrant should have been suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The State filed a timely Notice of Cross–Appeal from the trial court's finding that the search warrant was issued without probable cause. We have jurisdiction pursuant to Arizona Constitution article 6, section 9, and Arizona Revised Statutes Annotated ("A.R.S.") sections 12–120.21(A)(1), 13–4031, and 13–4033(A).

## II. DISCUSSION

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.[1] Likewise, in Arizona, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. 2, § 8. Search warrants serve a high function in guaranteeing our constitutional rights:

> Absent grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was not done to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law....

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV.

*McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

 Because the unlawful entry of homes by the government was the chief evil that the Fourth Amendment was designed to prevent, any invasion into the privacy of the home must be given careful scrutiny. *State v. Fisher,* 141 Ariz. 227, 237, 686 P.2d 750, 760, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). We review the trial court's ruling on the lawfulness of the searches *de novo* because it is a mixed question of law and fact that implicates constitutional rights. *State v. Buccini,* 167 Ariz. 550, 556, 810 P.2d 178, 184, *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 53 (1991); *see also United States v. Gonzales,* 979 F.2d 711 (9th Cir.1992) (appellate court reviews trial court's ruling on lawfulness of a seizure *de novo* and its findings of fact for clear error); *United States v. McConney,* 728 F.2d 1195, 1204–05 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

 Police officers may not enter a home without a warrant absent exigent circumstances. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *State v. Ault,* 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986). Exigent circumstances are "those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay until a warrant could be obtained." *State v. Greene,* 162 Ariz. 431, 432, 784 P.2d 257, 258 (1989). The specific, limited, and well-recognized exigent circumstances exceptions to the warrant requirement are 1) response to an emergency, 2) hot pursuit, 3) probability of destruction of evidence, 4) possibility of violence, or 5) knowledge that a suspect is fleeing or attempting to flee. *State v. White,* 160 Ariz. 24, 33, 770 P.2d 328, 337 (1989); *State v. Gissendaner,* 177 Ariz. 81, 83, 865 P.2d 125, 127 (App.1993). The mere incantation of the phrase "exigent circumstances," however, will not validate a warrantless search of a home. *Ault,* 150 Ariz. at 463, 724 P.2d at 549; *State v. Martin,* 139 Ariz. 466, 474, 679 P.2d 489, 497 (1984). The state must be able to point to specific and articulable facts from which the police concluded that the warrantless entry

was necessary. *People v. Duncan,* 42 Cal.3d 91, 227 Cal.Rptr. 654, 720 P.2d 2, 5 (1986). The burden is on the State to establish that the exigency justified the warrantless entry. *Fisher,* 141 Ariz. at 237, 686 P.2d at 760.

### A. *Officer McCaslin's Initial Entry*

 Defendant claims that Officer McCaslin's initial warrantless entry into his home violated his rights under the Fourth Amendment and the Arizona Constitution. The State responds that the initial entry was a reasonable response to an emergency situation. We agree with the State that a burglary in progress is an exigent circumstance which justifies a warrantless entry of the residence. *See Duncan,* 227 Cal.Rptr. at 656–57, 720 P.2d at 5. Defendant maintains, however, that the facts known to the officer at the time of his entry do not support a reasonable belief that the crime was still in progress. Therefore, the issue is what the police officer reasonably believed and whether his actions were reasonable in light of his beliefs.

Officer McCaslin responded to a suspected burglary in progress, but he had little information about the crime. He observed a forced-open window and detained two suspects who did not have a key to the residence. The suspected burglary in progress posed a potential threat to the residents of the house, to Officer McCaslin, and to the neighborhood. He believed that more suspects may be inside the house; therefore, for his own safety and the safety of the residents, he entered the house and conducted a protective sweep. The possibility that more suspects were still inside supports the reasonableness of Officer McCaslin's actions. It would have been poor police work if Officer McCaslin failed to further investigate when it appeared a crime was in progress. *Id.* at 657–58, 720 P.2d at 6.

During his protective sweep of the house, Officer McCaslin observed in plain view what he suspected to be an illegal drug laboratory. "In the course of conducting a reasonable search [the police do] not have to blind themselves to what [is] in plain sight simply because it [is] disconnected with the purpose for which they entered." *Id., quoting People*

*v. Roberts,* 47 Cal.2d 374, 303 P.2d 721, 723 (1956); *see Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Therefore, his initial entry and this inadvertent discovery of the drug lab during his protective sweep of the house was not a violation of Defendant's Fourth Amendment rights.

**B.** *The Subsequent Entries by Sergeant Saylor and the Drug Enforcement Bureau Officers*

Although Officer McCaslin's entry was permissible, that does not necessarily justify the subsequent entries of Sergeant Saylor and the DEB officers. Defendant contends that these subsequent warrantless entries were not justified by any exigencies; therefore, they violated his constitutional rights.

1. *The "Exigent Circumstances" Justification*

■ A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968); *Fisher,* 141 Ariz. at 239, 686 P.2d at 762. When the exigent circumstances cease to exist, the justification for the warrantless search also ceases to exist. *Duncan,* 227 Cal.Rptr. at 657–58, 720 P.2d at 6; *see also Mincey,* 437 U.S. at 393–94, 98 S.Ct. at 2413–14. "Where the police actions exceed those necessary to meet the exigencies, assertions that they were motivated by the exigencies alone must be strictly scrutinized." *Fisher,* 141 Ariz. at 239, 686 P.2d at 762. If the officers acted in a manner inconsistent with their purported safety motive, the warrantless entries cannot be justified after the fact by employing the exigent circumstances doctrine. *Duncan,* 227 Cal.Rptr. at 661–62, 720 P.2d at 10.

■ At the suppression hearing, the State argued that the dangerous nature of chemicals used to manufacture illegal drugs and the risk of fire or explosion justified the subsequent entries. Without explaining its reasoning, the trial court ruled that the warrantless entries by Sergeant Saylor and the DEB officers were reasonable and therefore did not violate Defendant's constitutional rights.

We are not persuaded by the evidence here that the officers' purported safety concerns justified their subsequent warrantless entries into Defendant's home. The officers' actions belie Officer McCaslin's testimony that he believed "there [was] definitely a potential for explosion or fire." Rather than taking precautions against a possible explosion or fire, the officers brought Peterson back into the living room of the house and held him there for over thirty minutes. They detained Johnson on the front walkway. Moreover, there is no evidence that the police called the fire department, evacuated or even notified the neighbors, or ventilated the house. Based on the irreconcilable inconsistencies between the asserted safety justifications and the officers' actions once inside, we cannot uphold the subsequent entries as reasonable under any exigent circumstances exception.[2]

2. *Confirmation of Suspected Illegal Activity*

■ The initial justification for Officer McCaslin's entry ceased following his protective sweep when he discovered that no more suspects were inside the house. However, when Officer McCaslin inadvertently observed what he believed to be an illicit drug

---

**2.** *Accord United States v. Impink,* 728 F.2d 1228, 1230–31 (9th Cir.1984) (asserted possibility that methamphetamine laboratory might have exploded did not justify warrantless entry when officers held suspects in house for two hours); *People v. Baird,* 168 Cal.App.3d 237, 214 Cal.Rptr. 88, 92 (Ct.App.1985) (warrantless search of methamphetamine laboratory was not justified under exigent circumstances exception when police did not treat it as an emergency and officer prevented occupants from fleeing the house); *cf. Duncan,* 227 Cal.Rptr. at 661–62, 720 P.2d at 10

(officer's actions confirmed exigency justifying warrantless entry of methamphetamine lab where officer paused outside the house only long enough to question the officers already present and the defendant about what was inside the house; he called the fire department as he entered; he remained inside only long enough to take pictures and to discover whether the laboratory was in operation; and, when firemen arrived, he ordered them to ventilate the house and shut off the gas and electricity).

laboratory, "he gained a new justification for being present in [D]efendant[']s house." *Duncan,* 227 Cal.Rptr. at 658, 720 P.2d at 6.

After observing what he believed to be a drug laboratory, McCaslin called his supervisor, who looked at the laboratory, and in turn, requested assistance from the DEB. The DEB officers looked at the suspect items and confirmed McCaslin's suspicions. These subsequent entries were only to confirm or refute McCaslin's suspicions of an illegal drug laboratory and were therefore justified by Officer McCaslin's reasonable suspicion of ongoing illegal activity.

We rely on *Duncan* for support. In *Duncan,* a police officer entered a dwelling based on a suspicion that a burglary was in progress. While lawfully present the officer viewed, in plain sight, "a lot of glassware, a couple of bags of white powder, one had … 'second cooking' written on it and then it had some grams written on the package, … a couple of containers with ether acetate, …" burners, tubing, a piece of paper with a formula written on it pinned to the wall, and the room smelled strongly of ether. *Id.* at 655–56, 720 P.2d at 4. The officer believed that he had discovered an illicit drug laboratory. Wanting confirmation that the items he found were in fact what he suspected, the officer called in his sergeant. In approving the officer's actions, the court maintained:

> It was far less an intrusion into defendants' privacy for an officer inexperienced in drug manufacturing to call in his supervisor to be certain that unlawful activity was afoot than it would have been if a full-scale search pursuant to a warrant had been launched, only to reveal the activity was innocent.

*Id.* at 658, 720 P.2d at 7.

Here, Officer McCaslin's discovery of chemicals, glass vials and lab equipment was enough for him to form a reasonable suspicion that what he had discovered was part of an illegal drug laboratory. Because of Officer McCaslin's limited experience with drug labs and paraphernalia, he was justified in soliciting his sergeant's advice and direction.[3] Similarly, when Sergeant Saylor realized someone with expertise in this area would be helpful, he asked for backup assistance from the DEB officers. Officer McCaslin was lawfully on the premises; therefore, his supervising sergeant's entry and the DEB officers' entry were "meant only to interpret what the first officer had already seen." *Id.* at 658, 720 P.2d at 6. These subsequent entries to verify the illegality of the evidence were "a minimal additional intrusion on the defendant's privacy." *Id.*

We, like *Duncan* and the dissent, denounce "confirmatory searches." The courts have condemned unlawful "confirmatory searches" in which an officer conducts an illegal search without a warrant or in the absence of an exigent circumstance for the purpose of assuring that it is worth his time and effort to obtain a search warrant. *People v. Cook,* 22 Cal.3d 67, 148 Cal.Rptr. 605, 583 P.2d 130 (1978). However, to label the actions of Sergeant Saylor and the DEB officers as a "confirmatory search" would be a misnomer. This case is distinguishable from the confirmatory searches the courts have condemned. In *Cook,* an officer with probable cause for a warrant unlawfully entered a dwelling to be "extra certain" before he obtained a search warrant. The court held that when an informant gives a police officer probable cause, the officer must then apply for a warrant—otherwise he can "achieve 'certain cause' by conducting an unlawful confirmatory search…." *Id.* at 623, 583 P.2d at 148. Here, Officer McCaslin lawfully entered Defendant's residence. It was during that lawful entry that he inadvertently observed what he suspected to be a drug laboratory. Sergeant Saylor's and the DEB officers' entries "went no further than [the investigating officer], and [were] meant only to interpret what the first officer had already seen." *Duncan,* 227 Cal.Rptr. at 658, 720 P.2d at 6. *See United States v. Menon,* 24 F.3d 550 (3rd Cir.1994) (justified in bringing documents found in plain view to

---

**3.** It is sufficient for police officers to act collectively and pool their knowledge for the requisite probable cause. *United States v. Lomas,* 706 F.2d 886 (9th Cir.1983); *United States v. Bernard,* 607 F.2d 1257 (9th Cir.1979); *State v. Maesse,* 29 Wash.App. 642, 629 P.2d 1349 (1981).

senior agent who confirmed that documents were described in warrant). The subsequent confirmation of Officer McCaslin's suspicions was a conscientious attempt to facilitate good police work with a minimum of intrusion.

## C. *Probable Cause Support for the Search Warrant*

■ Next Defendant contends, and the trial court agreed, that the search warrant was issued without probable cause. The affidavit stated that the home chemistry apparatus, chemicals, and glassware are "consistent with chemicals and glassware [used] to manufacture the dangerous drug methamphetamine." Officer McCaslin's suspicion and the confirmation of Sergeant Saylor and the DEB officers were sufficient to constitute "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). However, the trial court in its minute entry concluded that the DEB officers' "observations support a conclusion that these chemicals and laboratory equipment *could* be used for criminal activity, but there did not exist at that time evidence that they were or ever had been so used. This evidence ... does not meet the standard of probable cause." We disagree.

By itself, the chemicals, glass vials, and lab equipment observed by the DEB officers, would justify a reasonable person's conclusion that items connected with the sale and manufacture of methamphetamine would be found in Defendant's home if searched. *See Buccini,* 167 Ariz. at 556, 810 P.2d at 184 (probable cause exists if a reasonably prudent person would be justified in concluding that items sought are connected with criminal activity and items would be found at place to be searched). The DEB experts thought they had found a methamphetamine laboratory, an illegal activity. The search warrant's affidavit supported the magistrate's finding of probable cause; therefore, the evidence found during the search of Defendant's residence was admissible at his trial.

■ Even if probable cause did not exist, the trial court did not err in admitting the evidence under the good faith exception to the exclusionary rule. In *Leon,* 468 U.S. at 913, 104 S.Ct. at 3415–16, the court held that physical evidence "seized by officers reasonably relying on a warrant issued by a neutral and detached magistrate" is admissible in the prosecution's case-in-chief. This exception applies when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920, 104 S.Ct. at 3419.

Here, as in *Leon,* the officers found evidence during the execution of a warrant that the trial court later found to be unsupported by probable cause. As in *Leon:*

> In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

*Id.* at 926, 104 S.Ct. at 3422. Defendant makes no allegation of judicial or law enforcement misconduct. He merely alleges that no objectively reasonable police officer could believe that the warrant was supported by probable cause. In *Leon,* the court stated that the decision whether a police officer acted in an objectively reasonable manner should not be a complicated one: "When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Id.* at 924, 104 S.Ct. at 3421. This suggests that a police officer is not required to second-guess a magistrate's determination of probable cause unless the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923, 104 S.Ct. at 3421. This is not such a case. The affidavit presents the facts fairly and discloses the evidence which caused the police to suspect that Defendant was engaged in manufacturing and selling methamphetamine. Therefore, even if the trial court correctly found that the affidavit did not establish probable cause, the evidence found was admissible pursuant to the good faith exception to the exclusionary rule.

## III. CONCLUSION

Law enforcement officers cannot unreasonably search citizens' homes. Warrantless entries are *per se* unreasonable unless the police can demonstrate exigent circumstances such as the burglary in progress which Officer McCaslin faced. The state and federal constitutions do not prohibit officers from backing each other up in such circumstances, or from drawing on each others' expertise and experience in evaluating a crime scene. In this case, Sergeant Saylor and the DEB officers entered Defendant's home to verify or refute Officer McCaslin's reasonable suspicions. The subsequent confirmation of Officer McCaslin's suspicions was simply good police work with a minimum of intrusion that should be commended rather than rebuked.

For the foregoing reasons, the judgment and sentences are affirmed.

EHRLICH, J., concurs.

GRANT, Presiding Judge, concurring in part; dissenting in part.

In this case we hold that police officers responding to a burglary-in-progress may reasonably enter the residence without a warrant to search for suspects and protect the occupants and their property. I most certainly concur in that holding. We also hold that once the officers have secured the premises, they may not reenter unless additional exigent circumstances arise, or they obtain valid consent or a search warrant. I also concur in this holding. However, the majority goes beyond this to uphold a "confirmatory search" based on *People v. Duncan,* 42 Cal.3d 91, 227 Cal.Rptr. 654, 720 P.2d 2 (Cal.1986). On this point I part ways with the majority. I do not believe that the facts of this case support reliance on *Duncan* to uphold a "confirmatory search."

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. 1, § 8. The Arizona Constitution is even more explicit than its federal counterpart "in preserving the sanctity of homes and in creating a right of privacy." *State v. Bolt,* 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984); *see also State v. Ault,* 150 Ariz. 459, 463, 724

P.2d 545, 549 (1986); *State v. Martin,* 139 Ariz. 466, 473, 679 P.2d 489, 496 (1984). I concur with the majority that the initial entry by Officer McCaslin was a reasonable response to an emergency situation. I agree with the majority and with the state that a burglary-in-progress is an exigent circumstance which justifies a warrantless entry of the residence to search for suspects and to protect occupants and their property.

The right of the police to enter a dwelling and investigate an emergency is inherent in the very nature of their duties as peace officers. *State v. Fisher,* 141 Ariz. 227, 237, 686 P.2d 750, 760 (1984), *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). Therefore, the initial entry respected defendant's constitutional rights.

When Officer McCaslin entered the house, he could lawfully take steps reasonably related to the investigation of the burglary and the identification of additional suspects. *See State v. Greene,* 162 Ariz. 431, 433, 784 P.2d 257, 259 (1989). He observed the suspected drug lab during his protective sweep. At the suppression hearing he testified that he was concerned about the chemicals and wanted "to back out and get some experts in there ... because there is definitely a potential for explosion or fire." He called his supervisor, Sergeant Saylor, who in turn called the DEB officers. As the majority points out, Officer McCaslin's subsequent actions were not consistent with his testimony about the danger of fire or explosion.

Defendant contends that the subsequent warrantless entries by Sergeant Saylor and the DEB officers were not justified by any exigencies and therefore violated his constitutional rights. The majority agrees with the defendant that the warrantless entries by Sergeant Saylor and the DEB officers cannot be upheld as reasonable under any exigent circumstances exception to the warrant requirement. I concur in this holding.

On appeal, the state advanced a novel justification for these subsequent warrantless entries of defendant's home. The state concedes that a search based on exigent circumstances must end when the emergency passes, and that once Officer McCaslin fin-

ished his protective sweep of the house the exigent circumstances that supported his warrantless entry had passed. But the state asserts that when Officer McCaslin suspected that he had found a drug lab, he gained a new justification for being present in the defendant's house. The state further argues that because Sergeant Saylor's and the DEB officers' warrantless entries "were only to confirm or refute McCaslin's suspicions of an illegal drug laboratory, [they] were therefore justified...."

Contrary to the state's contention, the plain view doctrine did not apply to Officer McCaslin's observation of the lab equipment in the open closet and thus did not justify his continued presence in defendant's home. The plain view doctrine can legitimate action beyond the scope of an initial warrantless entry. *Arizona v. Hicks*, 480 U.S. 321, 325–26, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987). But the lab equipment was not in plain view because its evidentiary value was not immediately apparent. *See Ault*, 150 Ariz. at 464, 724 P.2d at 550; *State v. Cook*, 115 Ariz. 188, 194, 564 P.2d 877, 883 (1977) (holding that officer's mere suspicion that typewriter was stolen did not justify its seizure); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.5(b), at 129–30 (2d ed. 1987). Officer McCaslin suspected that the lab equipment may have been used to manufacture drugs but the equipment itself was not illegal. His mere suspicion of drug activity, however, did not permit Officer McCaslin to remain in defendant's home or to ask other officers to enter and search without a warrant. "Once police eliminate the dangers that justify a security sweep—safety of police, destruction of evidence, escape of criminals—they must, barring other exigencies, leave the residence. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes." *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir.1990).

When Officer McCaslin knew that there were no more burglary suspects but thought he had found a drug lab, his duty was to secure the premises and apply for a search warrant.[4] *Cook*, 115 Ariz. at 194, 564 P.2d at 883 (holding that trial court erred in not suppressing evidence seized during warrantless entry of apartment when officer knew immediately that suspect was not present but he suspected stolen property was in open closet); *cf. Fisher*, 141 Ariz. at 239, 686 P.2d at 762 (upholding two searches of apartment when officers' actions during first warrantless entry were "circumscribed by the exigencies that justified the intrusion", and the second search was conducted pursuant to a warrant obtained following the first entry). Instead, Officer McCaslin began a narcotics investigation in defendant's home without a warrant. He brought Sergeant Saylor and the Drug Enforcement Bureau officers into the house to confirm his suspicions.

The case on which the majority relies and cites extensively does not support a "confirmatory search" because the California Supreme Court reaffirmed its condemnation of "confirmatory searches":

> [W]hen an informant gives an officer probable cause to believe a search is justified, the officer must apply for a warrant. Otherwise, a police officer "need not rely solely on lawfully obtained probable cause; he can instead achieve 'certain cause' by conducting an unlawful confirmatory search, thus saving himself the time and trouble of obtaining and executing a warrant if he does not find the evidence."

*Duncan*, 720 P.2d at 6 (quoting *People v. Cook*, 583 P.2d 130, 148 (Cal.1978)); *see also People v. Superior Court (Shuman)*, —— Cal. App.3d ——, 247 Cal.Rptr. 538, 544 (Ct.App. 1988) ("Evidence obtained pursuant to a search warrant will be excluded where police had previously conducted an illegal 'confirmatory' search."). Nevertheless, the *Duncan* court found that a second officer's warrantless entry, unrelated to the exigent circumstances which justified the first officer's warrantless entry, did not violate the defendant's Fourth Amendment rights. 227 Cal. Rptr. at 657–58, 720 P.2d at 6. The court

---

4. Securing the premises entitled the officers to prohibit anyone from entering the home pending arrival of a warrant. "But this stricture includes the police. They also may not cross the threshold absent exigent circumstances." *Martin*, 139 Ariz. at 475, 679 P.2d at 498.

reasoned that even though the second officer's warrantless entry "was meant only to interpret [the suspected methamphetamine laboratory that] the first officer had already seen," the second officer's entry constituted only "a minimal additional intrusion on ,the defendant's privacy." *Id.*

I do not agree with the state and the majority that *Duncan* is good authority for the proposition that confirmatory searches are constitutionally permissible. *Duncan*'s denouncement of confirmatory searches conflicts with its holding that the second officer was entitled to enter the defendant's house without a warrant to confirm the first officer's suspicions. This inconsistent reasoning undermines *Duncan*'s authority.

Additionally, I cannot subscribe to *Duncan*'s rationalization that it is constitutionally permissible for one officer to call additional officers into someone's home just "to be certain that unlawful activity [is] afoot" because such an invasion is "far less an intrusion into defendants' privacy ... than [would occur] if a full-scale search pursuant to a warrant [was] launched, only to reveal the activity was innocent." *Id.* at 658, 720 P.2d at 7. Whether police may enter without a warrant does not turn on whether the warrantless search will be less intrusive than one conducted pursuant to a warrant. Rather, except for limited and specific "plain view" circumstances, only exigent circumstances compelling immediate police action will excuse the constitutional requirement that a magistrate or judge must weigh the need to invade an individual's privacy in order to enforce the law. *See Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978); *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193–94, 93 L.Ed. 153 (1948). The "let's con-

firm our suspicions now—we'll get a warrant later if it's worth it" approach suggested by the state would justify all kinds of lesser invasions ,of one's home subject only to an officer's discretion.[5] Such state conduct is precisely what our state constitution prohibits in its explicit language about preservation of the sanctity of the home. Therefore I do not believe that the majority's reliance on a California case has any bearing on the defendant's state constitutional claim. "It is precisely a warrantless *entry* that constitutes the invasion of the home and infringement of the right of privacy therein. The purpose of that invasion ... is irrelevant to the aggrieved citizen." *Martin,* 139 Ariz. at 474, 679 P.2d at 497.

Once Officer McCaslin viewed the items in defendant's closet but did not seize them under the plain view doctrine, the police were in the same position as though they possessed. reliable information showing defendant's home contained illegal drugs, and they were subject to the same rules of conduct. They were bound to present these facts to a magistrate and obtain a warrant.

Moreover, even if I agreed with the majority concerning *Duncan*'s reasoning, the present case is factually distinguishable in important ways. First, the officer in *Duncan* who stumbled on the suspected drug laboratory was "inexperienced in drug manufacturing." *Duncan,* 227 Cal.Rptr. at 658, 720 P.2d at 7. In contrast, Officer McCaslin had 19 years police experience, was trained to identify drug labs and narcotics, and had executed numerous search warrants with DPS and the DEA where drug labs had been discovered.

Second, in *Duncan* the second officer's actions can be viewed as back-up of the first officer under exigent circumstances, thus justifying the second officer's warrantless entry.

**5.** Allowing the officers' subsequent warrantless entries to stand would encourage future warrantless searches where the police might otherwise obtain a warrant:

> The incentives for ... illegal conduct are clear. Obtaining a warrant is inconvenient and time consuming. Even when officers have probable cause to support a warrant application, therefore, they have an incentive first to determine whether it is worthwhile to obtain a warrant. Probable cause is much less than certainty, and many "confirmatory" searches will result

> in the discovery that no evidence is present, thus saving the police the time and trouble of getting a warrant. If contraband is discovered, however, the officers may later seek a warrant to shield the evidence from the taint of the illegal search. The police thus know in advance that they have little to lose and much to gain by forgoing the bother of obtaining a warrant and undertaking an illegal search.

*Murray v. United States,* 487 U.S. 533, 546–47, 108 S.Ct. 2529, 2537–38, 101 L.Ed.2d 472 (1988) (Marshall, J., dissenting).

There, it was still unclear whether the drug lab was operating when the first officer called the second officer to assist him. *Id.* at 655–56, 720 P.2d at 4. The ether smelled so strongly that it made the first officer dizzy; when the second officer entered, he hustled the first officer out of the house because he feared an explosion and exposure to the chemical fumes. *Id.; see also State v. Mankel,* 27 Ariz.App. 436, 439, 555 P.2d 1124, 1127 (1976) (upholding warrantless entry by second officer to back-up first officer where officers were not certain whether violent crime had been committed inside burglarized residence).

The *Duncan* court itself warned that the constitutionality of such searches must be justifiable under the exigent circumstances exception and that "such a determination must be made on a case-by-case basis." 227 Cal.Rptr. at 655, 720 P.2d at 3. In *Duncan,* unlike this case, there were truly exigent circumstances creating an emergency situation requiring swift action. The house was filled with chemical fumes, there were Bunsen burners visible and a heat lamp operating. 227 Cal.Rptr. at 655–56, 720 P.2d at 4. Confirming the exigent circumstances was the fact that the officers called the fire department and instructed the firefighters to turn off the gas and electricity and to ventilate the residence. *Id.* *Duncan* is not a new exception to the warrant requirement called "a confirmatory search", it is an exigent circumstances exception case.

In the present case, however, Sergeant Saylor and the DEB officers entered defendant's house only to confirm McCaslin's suspicions, not to back him up. The glassware and chemicals stored in the closet did not present a crime in progress; the suspected lab was not operating and there were no fumes.

Most importantly, the subsequent warrantless entries in this case were not just "minimal additional intrusion[s] on the defendant's privacy." *Duncan,* 227 Cal.Rptr. at 658, 720 P.2d at 6. In contrast to *Duncan,* where the second officer hustled the first officer out of the house, Sergeant Saylor and Officer McCaslin spent two minutes looking into defendant's bedroom closet from one foot away.

Then, while they waited a half an hour for the DEB officers to arrive, two or three officers held the male burglary suspect in defendant's living room. When the DEB officers arrived, one of them stood on a chair in order to get as close a view as possible at the items stored in defendant's bedroom closet. Standing on defendant's chair to view items that were not clearly visible constituted an unlawful search of defendant's closet. *See Hicks,* 480 U.S. at 325, 107 S.Ct. at 1152–53 (officer's moving of stereo equipment to locate serial numbers constituted a "search" which required probable cause).

Defendant's constitutionally protected privacy interests cannot be trivialized by characterizing these repeated warrantless entries and the continuous police presence in his home as "minimal additional intrusions" on defendant's privacy. Our constitutional provisions were intended to give our citizens a sense of security in their homes and personal possessions. The *Duncan* court again warns: "The varied factual circumstances of these cases teach a clear lesson: there is no absolute rule that can accommodate every warrantless entry into premises housing a drug laboratory. It is manifest that the emergency nature of each situation must be evaluated on its own facts." 227 Cal.Rptr. at 660, 720 P.2d at 9. *"It is impossible to reconcile that sense of security [in one's own home] with the idea that the police may enter without warrant, inspect the premises, and hold everyone that they find until such time as they determine whether a warrant can be issued and brought to the home." Bolt,* 142 Ariz. at 265, 689 P.2d at 524 (emphasis added).

The exclusionary rule suppresses evidence obtained through a violation of a defendant's constitutional rights. *Ault,* 150 Ariz. at 465, 724 P.2d at 551. The "independent source" exception to the rule permits the state to introduce evidence that is obtained pursuant to a search warrant, provided the warrant was based on information legally obtained. *Martin,* 139 Ariz. at 477, 679 P.2d at 500. For the independent source exception to apply, the state must establish that the illegal entries had no effect in producing the warrant. *Murray v. United States,* 487 U.S.

533, 542 n. 3, 108 S.Ct. 2529, 2536 n. 3, 101 L.Ed.2d 472 (1988). If the decision to seek the warrant was prompted by what the police observed during their unlawful entries into defendant's home, or if information obtained during their illegal entries affected the magistrate's decision to issue the warrant, any evidence seized pursuant to the warrant must be suppressed. *Id.* at 542, 108 S.Ct. at 2535–36.

The trial court erred in denying defendant's motion to suppress because Sergeant Saylor's and the DEB officers' illegal entries tainted the subsequent warrant. The police decided to apply for the search warrant only after the DEB officers unlawfully entered defendant's home to confirm the other officers' suspicions. Detective Hanss' affidavit for the search warrant sets forth only what the officers observed during their unlawful entry: "several bottles of chemicals and glasswares to include beakers...." It then describes the training and expertise of the DEB officers, not Officer McCaslin, and states their conclusion that the "chemicals and glassware ... are consistent with chemicals and glassware to manufacture the dangerous drug methamphetamine." The affidavit contains no information obtained independently of the unlawful entries that would support issuance of the warrant. Thus, the information obtained during the unlawful entries of defendant's home was the sole basis for the magistrate's decision to issue the warrant, and the evidence seized pursuant to the warrant should have been suppressed. *Accord People v. Superior Court (Shuman),* 247 Cal.Rptr. 538, 542 (Ct.App.1988) [Rehearing granted July 1, 1988, opinion on rehearing not for publication Nov. 22, 1988.] (suppression is proper where police attempt to secure warrant in reliance on their own illegal search); *see also People v. Burr,* 70 N.Y.2d 354, 520 N.Y.S.2d 739, 514 N.E.2d 1363, 1367 (N.Y.1987) (where police conduct confirmatory search to ensure that there is probable cause to obtain a warrant, evidence seized under subsequent warrant should be suppressed) (dictum), *cert. denied,* 485 U.S. 989, 108 S.Ct. 1294, 99 L.Ed.2d 505 (1988). For the reasons stated I believe the evidence should have been suppressed.